NATIONAL LABOR RELATIONS BOARD

v.

FLORIDA CITRUS CANNERS COOPERATIVE.

No. 18186.

United States Court of Appeals Fifth Circuit.

March 27, 1961.

Marion Louise Griffin, Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Thomas J. McDermott, Asso. Gen. Counsel, N.L.R.B., Washington, D. C., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Frederick U. Reel, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

O. R. T. Bowden and Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JONES, Circuit Judge.

On February 6, 1957, as the result of an election held on January 29, 1957, an American Federation of Labor affiliate was displaced, as the bargaining representative of the respondent's employees at its Lake Wales, Florida, plant, by International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Citrus, Cannery, Food Processing and Allied Workers, Drivers, Warehousemen and Helpers, Local No. 173, which, for the sake of brevity, will generally be referred to as the union. At the respondent's plant citrus fruit is processed into concentrate, single strength juice, and grapefruit sections.

The union delayed until April the making of any request for the commencement of bargaining. Several meetings were held between April and August. Of these there is little in the record, although it appears that progress was made in the negotiations during this pe-

riod. Meetings were held in August and one meeting was held on September 19th. Four sessions were held in October. Differences were disclosed in the respondent's desire for management prerogatives and no-strike clauses, and maintenance of standards, hot cargo, separability and savings clauses desired by the union. At the last of the October meetings the union agreed that the next move was up to it.

On December 4, M. A. Stephenson, the respondent's production manager, and David F. Wingate, the union's chief representative, had a "man to man" talk, each expressing his personal views and neither of them attempting to bind his committee. There is a wide divergence between the testimony of Stephenson and Wingate as to what transpired at this interview. The Examiner, apparently, did not wholly believe either, since he found, "The true posture of this private meeting lies somewhere between the respective claims." The Examiner rejected the view of Wingate "that about all that was left was to call the committee together to ratify" the results which he and Stephenson had reached. But the Examiner found that "the notes and the discussions indicated that an agreement was not only possible but near." Such an inference was at variance with the testimony of Stephenson. It is, we think, not particularly vital to determine whether the facts regarding this private and "off the record" meeting were as related by Wingate, or by Stephenson, or, as the Examiner found, "somewhere between the respective claims." It was nothing more than what it purported to be and no reference was made to it in the subsequent bargaining sessions.

The next meeting was scheduled for December 18th. The Examiner and the Board have found that on and after this date the respondent refused to bargain in good faith.

On the nights of December 12 and 13 disastrous freezes occurred in the Florida citrus belt. There was no way, so the Examiner found, by which the extent of the loss and the effect on the industry could be gauged at that time. M. H. Walker, General Manager of the respondent, had been informed that because of the freezes other Teamsters locals had agreed to the suspension of negotiations with other citrus processors in order for the latter to appraise their situations in view of the freezes. Walker came to the meeting of December 18th which commenced about two o'clock in the afternoon, intending to ask for a delay in negotiations. This intention was announced at the opening of the meeting. The chief union representative, David F. Wingate, refused to listen to any statement on behalf of the respondent and insisted on first stating his position. The chief union negotiator informed the respondent that the freezes were not a factor which would be considered in negotiations. He informed the respondent's representatives that the union's negotiating committee was authorized to call a strike whenever it saw fit. He gave the respondent a deadline of four o'clock that afternoon to agree upon a contract or give assurances that a contract would be agreed upon. A strike was the alternative tendered by the union if the respondent refused to meet the union's ultimatum. Confronted with the union's strike threat, the respondent's general manager made no request for a delay in negotiations. He said "The clear unmistakable implication of your remarks, Mr. Wingate, is that if we don't sign a contract with you by tonight you will strike. This is a threat. I don't like threats, I don't respond under the pressure of threats, and I have nothing more to say." The meeting broke up. The union made no effort to prolong it.

The Examiner and the Board reached the conclusion that Walker should have made his plea for suspension of negotiations, but we see no reason why he should have done so in view of Wingate's declaration that freezes or no freezes, the respondent must, within two hours commit itself to a contract. The doing of a useless and futile thing is no more required in collective bargaining between an employer and a labor union than in

other activities. The Examiner and the Board reached the conclusion that, notwithstanding the uncertain effects of the freezes, the unwillingness of the union to consider, or even hear a request for a delay until the effects of the freezes could be appraised the refusal of the union to consider the freezes in bargaining, and notwithstanding the union's demand for a contract or a guarantee of one within two hours, the respondent *should have attempted to bargain.*

The Board has held in Adams Packing Association, Inc., 44 LLRM 1571, and this Court has held in N. L. R. B. v. Minute Maid Corporation, 5 Cir., 283 F. 2d 705, that the freezes here involved justified the insistence by Florida citrus processors upon a postponement of bargaining on economic issues until the effect of the freezes could be appraised. The Examiner found that a reasonable postponement would have been in order. The Wingate ultimatum not only demanded a bargaining on these issues (if it can be said that bargaining rather than yielding to the union terms was intended), but the reaching or guaranteeing of an agreement within two hours. The refusal of the union representatives to consider a request for a delay because of the freezes, and we do not see how any other effect can be given to the Wingate statement, placed on the union, and upon it alone, the responsibility for creating an impasse and for the termination of the ineffective meeting of December 18th.

On Christmas Day, M. A. Stephenson, the respondent's production manager, was at the plant, which was not operating that day. Also at the plant was J. E. Holly, then acting as a watchman. Holly quoted Stephenson as saying that a strike would be foolish, that it might close the plant and good men might lose their jobs; that they would all get along better if the union was "kicked out;" that the Company might have to meet with the union again for a time or two but the Company did not intend to sign a contract with the union and there would be no more meetings with the union after February 6 when the union could be de-

certified. Holly quoted himself as saying he was disgusted with the talk of a strike and dissatisfied with the conduct of the negotiations by the union representatives. He quoted Stephenson as suggesting that Holly and other dissatisfied employees should attempt to form a group to begin decertification proceedings, and as offering to procure legal counsel for such a group. Holly related that Stephenson told him that, in a few days, a pay raise would be posted on the bulletin board which would give the employees an incentive to get rid of the union. Stephenson's version of the conversation was vastly different. He denied, among other things, proposing that Holly initiate decertification proceedings and denied telling Holly that no contract would be made with the union. Stephenson's statement about a proposed pay raise, as he related it, was made in response to Holly's inquiry and was that the respondent was considering making a proposal on wages to the union. The Examiner credited the testimony of Holly and discredited the testimony of Stephenson. On the direct conflicts between the testimony of the two the General Counsel's burden of proof, if sustained, is carried only by reason of the determination of the Examiner that Holly is to be believed and Stephenson is not. Holly is not shown to have taken any part in any effort to decertify the union. It is not shown that he either encouraged or discouraged adherence to the union. He related conversations with other employees who were opposed to the union but their opposition is not shown to have been inspired by or known to the respondent. Our unwillingness to rely upon the crediting of Holly by the Examiner and his discrediting of Stephenson is hereafter set forth.

On January 4, 1958, the respondent submitted to the union a proposal for a pay raise of 5½ cents per hour. A letter recited the difficulties resulting from the freezes and stated that the offer compared favorably with raises granted by other companies. Wingate, the principal negotiator for the union, inquired,

so he testified, whether a contract proposal was to accompany the pay raise offer and was told, so he testified, that the Company was not submitting a new contract proposal. It was Stephenson's testimony that he told Wingate that respondent's contract terms, except as to wages, were before the union negotiators and were well known to them, and no further contract proposal to accompany the wage offer was required. Wingate, as business representative of the union, advised Stephenson by letter dated January 10, 1958, that the membership of the union had rejected the respondent's wage offer. The letter submitted a contract which was substantially the same as had been tendered with the dead-line ultimatum made on behalf of the union on December 18, 1957, except as to the demand for a wage increase which was lowered from 25 cents per hour to 8½ cents per hour. In the letter it was twice said that it was a "last and final" offer, and its finality was stressed by the statement that "unless this is acceptable to Florida Citrus Canners Coop we have no alternative but to take action as we deem necessary to bring the issues to a conclusion." A reply was requested but no meeting was sought.

On or about January 16, 1958, the respondent posted to its employees a letter [1] over the signature of Stephenson, in which the employees were advised that the union had rejected the wage increase, information was requested as to threats and intimidation, a report on the effects of the freezes was given, and an offer was made to furnish information or answer questions concerning the general situation. On January 17, 1958, the union called a strike. A little more than a third of the employees went out.

The respondent replaced 274 of the striking employees and notified them that they were discharged. Ten of the discharged strikers were given notice to vacate the company-owned dwellings they had been occupying. One of these, J. W. Montgomery, moved into a house

1. "To Our Employees—

"The Teamsters Union has refused to agree to the Company putting into effect the wage increases proposed and posted which were intended to have been effective in the week ending January 26, 1958 together with back pay at the new rates being figured back to December 16, 1957, and distributed to each employee. This back pay alone estimated at over $10,-000.00.

"We quote from a letter dated January 10, 1958 and signed by David F. Wingate, Business Representative, Local 173—

" 'With reference to our Contract and Wage negotiations, please be advised that the membership of Local 173 took official action on January 9, 1958 on the Wage Proposal submitted by you on January 4th. Your proposal was unanimously rejected.'

"The Company regrets that under these present circumstances the increases will not be made effective on the dates we proposed. We hope that every employee took advantage of the right given them under the law to voice their opinion and vote on this matter which seemed to me vitally important to each one. We hope, too, that every employee understands that Union membership is not a requirement to work or to vote on such a question. Membership in a Union may only be required to vote on and engage in the internal affairs of a Union, as when electing officers, etc.

"The Company is concerned about reports and rumors of threats and intimidation being practiced by some of our employees on their fellow workers. This is illegal by law and contrary to Company rules. We invite anyone so threatened to inform us of the event and we will follow valid reports with disciplinary action.

"We are making every effort to obtain suitable fruit for all operations and pack as much as possible before the fruit becomes unusable or the remaining short supply runs out. Recently released official estimates by the U. S. Department of Agriculture of the fruit loss from freezing show that there are at least 22 million (22,000,000) boxes of oranges and 4 million (4,000,00) boxes of grapefruit less for industry to use. We agree with many others in the industry that the final loss figures will be much higher, especially so far as product processing is concerned.

"If we can be of any assistance in providing information or answering questions concerning the general situation, please feel free to contact me directly or through your foreman."

at a rental described by him as "rather right smart higher" than he had been paying. An attorney employed by the union brought suit in the Florida Circuit Court to enjoin the eviction of the others and the action was pending and the nine discharged strikers were still in possession at the time of the hearing before the Examiner.

Soon after the strike was called the union sought another meeting, and the respondent agreed. The meeting was held on January 28th. Wingate, although present at this meeting, was replaced as the union spokesman by a representative of the Teamsters International Brotherhood. Some time was spent in acquainting the new negotiator with the prior negotiations. But progress was being made and agreements were had on a number of questions when, after the respondent had declined to acquiesce in a union demand, the International representative accused the chief negotiator for the respondent, an attorney, of taking a particular position for the respondent in order that he might make a fee. The attorney countered by saying that he had not, at least, taken the Fifth Amendment fifty-seven times before the McClellan Committee. The negotiator sent in by Teamsters International denied that he had asserted his constitutional immunity fifty-seven times and stated that the correct number was fifty-four. This unfortunate incident, precipitated by the union, resulted in an atmosphere of tension and created another impasse. Further negotiations at this session were, of course, impossible and the meeting broke up. The respondent declined a request for a bargaining session that night. Bargaining was not thereafter resumed. Neither party thereafter attempted to reopen the bargaining until after it appeared that the union had lost its majority. The union representatives testified that respondent's representatives had said they would contact them. The testimony is not sufficiently explicit to sustain a refusal to bargain charge for failure of the respondent to contact the union for a resumption of bargaining. Cf. N. L.

R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660.

When the year had expired following the election which had resulted in the designation of the union as the bargaining representative of the employees, petitions were circulated by employees for the withdrawing of authorization for representation by the union. The solicitations for signatures on the petitions were made, in part at least, during working hours. The petitions were signed by 76.2 percent of the employees. The petitions were delivered to the respondent on February 7, 1958. On February 17, the respondent advised the union that it had received the petitions and it was apparent that the union did not then represent a majority of the employees. On February 20, the respondent announced that the wage increase which it had previously offered, but which had been rejected by the union, would be put into effect. On February 24, the union requested a meeting. The respondent declined to meet unless the union was prepared to show that it then represented a majority.

On January 14, 1958, the union filed a charge against the respondent, the basis of which was that the respondent had refused to bargain on or about December 18, 1957, and thereafter. An amended charge, filed on March 13, 1958, had as its basis a refusal to bargain on or about July 14, 1957, and thereafter, and that on January 19, 1958, and other dates, the respondent discharged employees because of membership in an activity on behalf of the union. A complaint followed, a hearing was had before the Board and its order was entered.

The intermediate report of the Examiner, which covers seventy-five pages of the Transcript of Record, was affirmed in all respects except one by the Board. 124 N.L.R.B. 1182. The exception is not here material. It was found that respondent refused to bargain on and after December 18th, that the strike was caused by the refusal to bargain and that it was, from its inception, an unfair labor practice strike. These were the findings

on issues referred to by the Examiner as the principal issues. The minor issues, as said by the Examiner, involved "a miscellany of alleged interference, restraint and coercion, and the alleged discrimination against certain tenant-strikers through efforts at eviction." These minor issues were also resolved against the respondent.

To a considerable extent the findings of the Examiner and the Board are dependent upon the acceptance of the testimony of Messrs. Wingate and Holly rather than the contradictory testimony of witnesses for the respondent. The Examiner believed Holly and where sharp conflicts appeared on crucial facts, he believed Wingate. On such issues the Examiner disbelieved the witnesses for the respondent. The attitude and approach of the Examiner are reflected in the statement made in the Intermediate Report with respect to John Roberts who had been the union's chief negotiator from the time that bargaining began in April until the end of August, 1957. The union's amended charge and the General Counsel's complaint asserted that the respondent had refused to bargain on and after July 14, 1957. From the Examiner's report we quote:

"Because of a circumstance which was unfortunate to his case, the General Counsel was unable to present any evidence of value supporting his position concerning the April through August negotiations. That circumstance was the fact that Roberts left the Union and went with the management of Minute Maid around the first of September. That alliance with the 'opposition' not only placed Roberts in such a position which the General Counsel apparently felt would jeopardize any reliance upon him as a witness, but it developed that Roberts' relations with his former associates were such that they made no attempt after his defection to review with him either the course of his negotiations or the results which he had obtained to date."

The words quoted above, it is to be noted, are the deliberately chosen expressions of an Examiner who had made findings, which we are asked to accept, as to whether the testimony of a union adherent or the conflicting testimony of an employer's executive is worthy of belief. Roberts, it is said, defected; in other words, he deserted his cause. He formed an alliance with the "opposition." Did he, by becoming an employee of Minute Maid, place himself in opposition to General Counsel? Was General Counsel justified in his apparent feeling that Roberts was unworthy of belief because he had become an employee of a fruit processor which was engaged in a controversy with the union? So it seems, and it seems that to the Examiner this is an unfortunate circumstance in that the witness whom General Counsel would have otherwise called has defected and is no longer employed by the union and would no longer tell the truth. The relations of Roberts with his former associates were such, so says the Examiner, that they made no attempt to review with him the course of his negotiations or the results obtained by him. The former associates, we assume, were in the union. It is not suggested that those in the office of the General Counsel had developed any such relationship with Roberts that inquiry might not have been made by them as to what transpired while Roberts was acting for the union. After all, these proceedings were instituted by General Counsel and he has the burden of proving his complaint. The foregoing references to the Examiner's observations regarding Roberts are not made by reason of any direct bearing which they had upon the issues before the Examiner, the Board and this Court, but because they so clearly disclose the Examiner's views as to the determining of the credibility of witnesses. The Examiner's findings are not to be "given more weight than in reason and in the light of judicial experience they deserve." Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 469, 95 L.Ed. 456. This Court has heretofore found it neces-

sary to question the inferences drawn and findings made where the Examiner has uniformly credited the evidence for the General Counsel and generally disbelieved the evidence for the employer. N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir., 1955, 222 F.2d 341. Cf. N. L. R. B. v. Cosco Products Co., 5 Cir., 1960, 280 F.2d 905. There is some testimony here which was introduced by General Counsel which the Examiner rejected but in all material conflicts between the testimony of the General Counsel and that of the respondent, the credibility issues were resolved against the respondent. But there is, or so it seems to us, a more cogent reason for questioning the Examiner's credibility findings. The expressed view of the Examiner that where a person has defected from a union and formed an alliance with the "opposition," that is to say, with an employer of labor, such person would be unable to give any "evidence of value" and that such "alliance" would "jeopardize any reliance upon him as a witness." We do not believe we have distorted the Examiner's meaning by taking his words out of context. We think it can fairly be inferred that the Examiner was of the belief that reliance may not be placed upon the testimony of a witness who is a part of the management of an employer in a controversy with a labor union. We think we are required to test the Examiner's credibility findings in the light of his theory of credibility as he has declared it.

The respondent had enjoyed a good relationship with the union which had previously represented its employees. Prior to the conversation between Holly and Stephenson on Christmas Day of 1957, the negotiations between the respondent and the Teamsters Union had been such as to indicate a cordial relationship. There had been delays but these, in substantially all instances, were occasioned by the union. There was no evidence of anything transpiring prior to the Holly-Stephenson conversation that would have indicated an anti-union animus on the part of the respondent. The finding of an anti-union feeling is based almost entirely on the Holly testimony. All of the conduct of the respondent was viewed in the light of such finding. The Examiner's finding of a plan of the respondent not to bargain is dependent upon crediting Holly's testimony. Inferences drawn against the respondent were supported by the assumption that its conduct was motivated by hostility to the union. It might be said that Stephenson, as a part of the respondent's management, was not a disinterested witness. But he was no more interested than Holly, who had gone on strike, had been replaced, and was hoping for reinstatement with back pay. Notwithstanding the absence of any prior anti-union animus or action of the respondent, and notwithstanding the improbability that the respondent's production manager would disclose its labor program and its plans for carrying out such program to a plant watchman, the Examiner believed Holly and disbelieved Stephenson. The Board adopted the Examiner's finding. Sound reason, in this case, requires us to decline to go with the Examiner in crediting Holly and discrediting Stephenson.

The Examiner made no express finding with respect to the credibility of Wingate. There were instances where the Examiner disbelieved or doubted the accuracy of Wingate's testimony. In respect to one instance the Examiner found "there are significant circumstances which prevent acceptance of Wingate's view * * *." In a case where the Examiner was in doubt as to whether the truth was reflected by the testimony of Stephenson or that of Wingate the Examiner commented that "The conflict, therefore, concerns no critical matter." In another instance, an inaccurate statement of Wingate was excused with the observation of the Examiner that "it reflected only ineptness or carelessness on Wingate's part." On crucial questions, dependent for their answers on whether Wingate or Stephenson should be believed, the Examiner resolved the questions against the respondent, thus showing an acceptance of Wingate's testimony and a rejection of that of Stephenson.

While the Examiner is not required to apply the maxim, Falsus in uno, falsus in omnibus, the testimony of a careless and inept witness, whose recollection of some matters cannot be accepted, and whose statements are doubted with respect to issues which are not crucial, should, with respect to crucial questions, be more carefully scrutinized than has been done in this case.

 It might have been courteous for the respondent to have complied with the Union's request for a reply to its January 10th letter but it was not, we think, under any duty to do so. The respondent, after negotiations were terminated on December 18th, was under a duty to resume bargaining, but only if so requested by the union. American Federation of Grain Millers, A. F. of L. v. N. L. R. B., 5 Cir., 1952, 197 F.2d 451. The letter of January 10th was not a request for the respondent to bargain, it was a "take-it-or-leave-it" demand with the "or else" threat incorporated. The attitude of the union that it was not willing to negotiate was implicit, if not fully expressed, in its letter. The failure of the respondent to reply to such a letter is not, we conclude, a refusal to bargain nor evidence of such a refusal.

 We think it is clear that the respondent had not failed in its duty to bargain at the time of the strike. This being so, and the strikers having been replaced and discharged before requesting reinstatement, they are not entitled to reinstatement. N. L. R. B. v. United States Cold Storage Corporation, 5 Cir., 1953, 203 F.2d 924, certiorari denied 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 344; American Federation of Grain Millers, A. F. of L. v. N. L. R. B., supra. It follows that the respondent is entitled to the possession of the company-owned houses from which certain of the striking employees refused to move.

 Evidence was before the Board that foremen of the respondent had told striking employees that they would or might lose their jobs or seniority unless they returned to work. The Board finds that these threats, as they are referred to, were coercive and intimidating. Such would be true if the strike had been an unfair labor practice strike. Since it was not, and since the respondent had the right to replace and discharge those on strike, it was not an act of interference for representatives of the respondent to inform the strikers that it would or might do that which it had a right to do and subsequently did do.

 As the Board points out, an employer is not relieved of its duty to bargain by reason of the loss by the union of its majority if the loss is attributable to unfair labor practices of the employer. N. L. R. B. v. Lambert, 5 Cir., 1954, 211 F.2d 91. In urging that this principle is here applicable, the Board recites the posting of the notice of the union's rejection of the wage offer and the inclusion in the notice of the offer to provide information or answer questions, the permitting of the circulation during working hours of petitions for the withdrawal of union recognition, and, of course, refusal to bargain. The Examiner and the Board characterize the posted notice as "inviting wrath upon the Union" and as "an incentive to union defection." We cannot see in the offer to provide information or answer questions concerning the general situation the insidious implications which are so apparent to the Examiner and the Board. The offer follows a brief discussion of the situation relating to the freezes and would naturally relate to them. A reference to the general situation would not normally be regarded as having to do with a specific wage proposal. Permitting the soliciting during working hours of employee signatures on petitions for the withdrawal of union recognition does not seem to be an unfair labor practice. Cf. N. L. R. B. v. United Steelworkers of America, 357 U.S. 357, 78 S. Ct. 1268, 2 L.Ed.2d 1383. We have discussed and will hereafter mention the contentions with respect to the charge that the respondent refused to bargain in good faith with the union. We have concluded that the determination by the

Board that the loss of the union's majority was attributable to unfair labor practices of the respondent is not supported by substantial evidence on the record as a whole.

We are told by the Board that it is the settled rule of law that an existing certification must be honered until lawfully rescinded. The Board asserts that the respondent was under a duty to continue to deal with the union and to petition the Board for a new election. Such is the general rule approved in this Circuit. N. L. R. B. v. Auto Ventshade, Inc., 5 Cir., 1960, 276 F.2d 303. The general rule is not without exception. See Texas Foundries v. N. L. R. B., 5 Cir., 1954, 211 F.2d 791, where it is held that an employer was justified in advising a union that it had lost its majority status during an unlawful strike. See also Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, 42 A.L.R.2d 1405; N. L. R. B. v. Globe Automatic Sprinkler Co., 3 Cir., 1952, 199 F.2d 64. We are convinced that it was not intended by the Congress that employees should be required to accede to a representation which they have repudiated, in this case, by more than three-fourths of the bargaining unit. It might be said here, as this court has before said:

"If we should compel respondent to bargain further with this union, which the employees themselves have obviously repudiated, the result would be to deny them the right, secured by the Act, to bargain through the representative of their choice." N. L. R. B. v. Mayer, 5 Cir., 1952, 196 F.2d 286, 289.

We do not think the rule requires an employer to bargain with a union which has demonstrably lost its majority and where the filing of a petition for decertification would be futile. N. L. R. B. v. Sanson Hosiery Mills, 5 Cir., 1952, 195 F.2d 350, certiorari denied 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669. At the time this matter was developing the Board was declining to process petitions for elections to determine whether a certified union continued to have a majority if, as was the case here, an unfair labor practice charge against the employer was pending before the Board. N. L. R. B. v. Minute Maid Corporation, supra. The Board here urges that the employer was required to petition for decertification. In Minute Maid, a nearly parallel case, occurring at about the same time, the Board sustained the dismissal of such a petition. After the petitions repudiating the union were in the hands of the respondent, we think that, under the facts here shown, it was not required to indulge in a useless gesture of petitioning for a decertification. Neither was it required, and probably it should not have been permitted, to engage in further bargaining with the union.

The Board took the position that the granting of the pay raise on February 20 was an unfair labor practice. We have here a situation where the wage increase is not greater than was offered during collective bargaining, and where the union had lost its representation of the bargaining unit. Under such circumstances the respondent owed no duty to the union which was breached by the granting of the pay increases. See N. L. R. B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, rehearing denied 337 U.S. 950, 69 S.Ct. 1512, 93 L.Ed. 1752.

We have already discussed some of the questions which the Examiner refers to as "minor ones involving a miscellany of alleged interference, restraint, and coercion." The consideration of those not already discussed need not greatly extend this already overlong opinion. Most of these were of statements made by some of the respondent's supervisory employees to those who were engaged in the strike, and these have already been considered. Other statements attributed to foremen and other lower strata supervisory personnel are not to be condoned but are not enough, either taken separately or in conjunction with other events, to form the basis for an unfair labor practice charge.

The charging union has filed a motion for leave to intervene. The mo-

**640**

tion is denied. Haleston Drug Stores, Inc. v. N. L. R. B., 9 Cir., 1950, 190 F.2d 1022; Aluminum Ore Co. v. N. L. R. B., 7 Cir., 1942, 131 F.2d 485, 147 A.L.R. 1.

The petition for enforcement will be Denied.