**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**THREADS, INCORPORATED,
Respondent.**

No. 8464.

United States Court of Appeals
Fourth Circuit.

Argued March 21, 1962.

Decided Aug. 29, 1962.

Warren M. Davison, Atty., N. L. R. B. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Samuel M. Singer, Atty., N. L. R. B., on brief) for petitioner.

· J. W. Alexander, Jr., Alexandria, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

On July 26, 1961, National Labor Relations Board, by a duly constituted and authorized three-member panel, issued its decision and order[1] against Threads, Incorporated (hereinafter called Company or Threads), and now petitions this court for enforcement.

The Board found that Threads violated section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1), by attempting to induce employees previously discriminatorily discharged to waive their rights to reinstatement; by unlawfully interrogating an employee; by subjecting employees to excessive watching; and by threatening its employees that there would never be a union in the plant and that a union would be to their detriment. The Board further found that Threads violated section 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (3) and (1), by discriminatorily

discharging two of its employees, William Bell and Leonard Fields. The Board ordered the Company to reinstate discharged employees Fields and Bell without loss of pay, seniority or other rights and privileges and to post at its Gastonia, North Carolina, plant a certain notice to employees.

Preliminarily, it appears necessary to review certain facts. In 1958, following an organizational campaign, Textile Workers Union of America, AFL–CIO, petitioned for a representation election among Threads' employees, which election was directed and which the Union lost. Pursuant to charges filed by the Union, the Board issued a decision and order on September 18, 1959, determining that the Company had violated section 8(a) (1) of the Act by interrogating employees concerning their union activities and by threatening employees with various forms of economic reprisal if they engaged in such activities. The Board then ordered Threads to cease and desist from this unfair labor practice, directed that the election be set aside and that a new election be conducted when the circumstances would permit the free choice of a bargaining representative. Threads sought no judicial review. The second election has not yet been conducted.

In a second complaint case the Trial Examiner found, as charged, that Threads was guilty of unfair labor practices and had discriminatorily discharged Leonard Fields, James Goodson and Glenn Underwood. On August 17, 1960, the Board adopted the Examiner's find-

1. 132 N.L.R.B. No. 30.
   The Board ordered the Company to cease and desist from:
   (a) Discouraging membership in and activities on behalf of Textile Workers Union of America, AFL–CIO, or any other labor organization, by discriminatorily discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment, or any term or condition of employment;
   (b) Subjecting any discriminatorily discharged employee, or any other employee,

to excessive watching of their legitimate activities during their working hours, in a manner constituting interference, restraint, or coercion within the meaning of Section 8(a) (1) of the Act;
   (c) Interrogating employees concerning any personal notetaking in any manner constituting interference, restraint, or coercion within the meaning of Section 8(a) (1) of the Act;
   (d) In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed by Section 7 of the Act.

ings and ordered Threads to reinstate the three discharged employees with back pay. On April 14, 1961, this court granted summary enforcement of the Board's order.[2]

## THE INSTANT PROCEEDING

The present proceeding, which is a third complaint case, followed happenings subsequent to the Board's order directing the reinstatement of Goodson, Fields and Underwood. In the latter part of February 1960, some two weeks after the issuance of the Intermediate Report in the second complaint case, J. W. Thompson, the Company's personnel director, instituted negotiations with Goodson, Fields and Underwood concerning possible waivers of their rights to employee reinstatement. Each of these employees was separately contacted and interviewed. Goodson refused an offer of $1,000 but about a week later accepted an offer of $2,000 and signed a waiver of his right to reinstatement. After Thompson had met on more than one occasion with Fields and Underwood, each of these discharged employees demanded $5,000 for a waiver of reinstatement rights, which demands were refused.

On April 13, 1960, Fields and Underwood were offered jobs and were ordered to report for work on April 21. Prior to reporting as directed, they were again separately interviewed by Thompson, who told them they were being reinstated to their old jobs despite the Company's conviction that their previous discharges had been for just cause. Thompson had each sign an employment application form which concluded with the statement: "I have read (or have had explained to me) the Company and plant rules and I understand that I am expected to observe these rules." Thompson told them that any changes in the rules would be explained by their foreman although there had been no changes since they were discharged.

Following reinstatement of Fields and Underwood, they and all the other dye-house employees on the second shift were assembled and addressed by Koppen, Company general superintendent. Koppen opened by "welcoming back" Fields and Underwood. He reaffirmed the Company's conviction that they had been previously discharged for cause and stated that, although the Company could have contested the Board's ruling, it had chosen not to do so but instead "to offer these men another chance to do their jobs satisfactorily." He continued:

"To these two men I would like to make this specifically and directly clear—we are willing to have you back so long and only so long as you do your work satisfactorily. In order to stay here, you will be expected, just like every other employee, to perform your job and perform it right."

Next, Koppen discussed note-taking by the employees. He emphasized the confidential nature of the Company's dyeing formulas and methods and warned that the removal of such data from the plant, which could adversely affect the Company's competitive position in the market, would be grounds for immediate discharge.

Finally, Koppen turned to the subject of the Union:

"Now with regard to the Union I want to make the Company's position on this subject as clear and plain as I can:

"We are opposed to the Union. We consider it not only a matter of concern to the Company but also a serious concern to you. It is our sincere belief that if this Union were to ever get into this plant it would not work to your benefit but to your serious harm.

"It is therefore our positive intention to oppose the Union and by every *proper* means to prevent it from coming into the plant.

"*Those who might join or apply to a union will never get any ad-*

2. N. L. R. B. v. Threads, Inc., 4 Cir., 289 F.2d 483.

*vantage or any preferred treatment of any sort over those who do not join or apply to any union.*

"No person will ever be allowed to carry on union organizing activities on the job here. If anybody undertakes to do so and thereby neglects his own work or interferes with the work of others, that person will be discharged.

*"It is not necessary, and it is not ever going to be necessary, for anybody to belong to any union in order to work for this company!"* (Emphasis supplied.)

The ceremonies concluded with Koppen reminding the employees that the Company had given them two pay increases during the past year. He subsequently read the same speech with certain irrelevant deviations to the other dyehouse employees on the first and third shifts.

Except as hereinafter particularly noted and except for relatively minor details, the Board adopted the Intermediate Report and Recommended Order of the Trial Examiner. Before us for review on the petition for enforcement are the provisions of the Board's decision and order.

Before considering the questions here presented, it seems appropriate to look closely to the rules which should be applied on this review of the Board's findings, conclusions and order.

Following enactments of the Administrative Procedure Act in 1946, 5 U.S.C.A. § 1001 et seq., and amendments to the National Labor Relations Act (Labor Management Relations Act, 1947) and prior to 1950, a conflict of opinion developed among certain United States Courts of Appeals regarding the effect of the new legislation on the duty of such courts when called upon to review orders of the National Labor Relations Board. The Supreme Court of the United States took note of the situation and agreed to settle this clash of opinion as to the scope of judicial review. On February 26, 1951, that Court decided Universal Camera Corp. v. National Labor Rela-

tions Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 and National Labor Relations Board v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479. The decision in the latter case was stated by the Court to be controlled by the decision in the former. Mr. Justice Frankfurter delivered the opinion in each case.

In Universal Camera the Court referred to what appeared to have been a general understanding of the standard for reviewing the evidentiary validity of the Board's findings as determined by the courts under the provisions of the Wagner Act (Act of July 5, 1935, § 10 (e), 49 Stat. 449, 454, 29 U.S.C.A. § 160(e)), that is, a narrow and limited scope or power of review. At 340 U.S. 479, 71 S.Ct. 460, the Court stated:

" * * * Protests against 'shocking injustices' and intimations of judicial 'abdication' with which some courts granted enforcement of the Board's orders stimulated pressures for legislative relief from alleged administrative excesses." (Footnotes omitted.)

The Court reviewed carefully the legislative history of the Administrative Procedure Act and the National Labor Relations Act as amended and stated:

"From the legislative story we have summarized, two concrete conclusions do emerge. One is the identity of aim of the Administrative Procedure Act and the Taft-Hartley Act regarding the proof with which the Labor Board must support a decision. The other is that now Congress has left no room for doubt as to the kind of scrutiny which a Court of Appeals must give the record before the Board to satisfy itself that the Board's order rests on adequate proof." 340 U.S. at 487, 71 S.Ct. at 464.

\* \* \* \* \* \*

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and

of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. * * *" 340 U.S. 487–488, 71 S.Ct. 464–465.

" * * * Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." 340 U. S. at 488, 71 S.Ct. at 465.

* * * * * *

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being jus-tified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." 340 U.S. at 490, 71 S.Ct. at 466.

Thus did the Supreme Court undertake to lay down certain guide lines with respect to the duty and power of Courts of Appeals when reviewing decisions of the Labor Board, at the same time noting that even though a formula for judicial review may "afford grounds of certitude" it cannot assure "certainty of application."

In National Labor Relations Board v. Walton Mfg. Co., and (National Labor Relations Board v. Florida Citrus Canners Co-op.), 369 U.S. 404, 82 S.Ct. 853, 855, 7 L.Ed.2d 829, both decided as recently as April 9, 1962, the Supreme Court considered decisions of the Court of Appeals for the Fifth Circuit which had denied enforcement of orders of the Board. 286 F.2d 16; 288 F.2d 630. The majority thought the Court of Appeals had fashioned and possibly improperly applied one rule concerning the weight of evidence necessary to sustain the Board's orders for reinstatement of discharged employees with back pay, and a different rule concerning the weight of evidence necessary to sustain cease and desist orders. The cases were remanded for reconsideration. Mr. Justice Frankfurter, joined by Mr. Justice Harlan, dissented although concurring with the majority that "there is no place in the statutory scheme for one test of substantiality of evidence in reinstatement cases and another test in other cases." The dissenters did not think either of those cases presented an appropriate occasion for admonishing the Fifth Circuit against applying a double standard. They interpreted the majority decision as a departure from Universal Camera, as laying down a rule which would deny "acceptance of plausible, uncontradicted, unimpeached testimony of motivation" and as holding the Board's power in reviewing the dead record to determine witness credibility "to be absolute and unreviewable." 369 U.S. at 417, 82 S.Ct. at 860.

■ We believe, however, that we are warranted in following the principles announced in Universal Camera as a guide in reviewing such cases as the one before us. We have examined and considered the whole record, not only all evidence which in and of itself would justify the Board's decision but also contradictory evidence or evidence from which conflicting inferences could be drawn. Our conclusions are hereinafter set forth.

The Examiner and the Board found that the Company, through Thompson, had made threats to Goodson, Fields and Underwood that they would again be fired by their foremen if they were reinstated, had coercively attempted to induce them to waive their rights to reinstatement and had thereby "interfered with, restrained and coerced its employees in violation of section 8(a) (1) of the Act." The Company seeks to justify Thompson's conduct in his efforts to procure waivers of rights to reinstatement upon the theory that the Company was then undecided as to whether it should appeal to the full Board from the Examiner's Recommended Order with respect to rehiring the discharged employees; that each was being offered no more than he would receive pursuant to Board determination although the payment would be sooner; that the Company was primarily interested in the financial aspects of the proposed reinstatement.

It was clear, however, that the Company did not want these discharged employees back in the plant and presented arguments designed to persuade them that their return would create unpleasant working conditions. It appears that Thompson's efforts to procure releases actually continued after the time had expired within which an appeal to the full Board could have been taken and that he repeatedly requested each of these employees to name a sum which would be acceptable in return for releasing reinstatement rights, such sum having no particular relationship to the back wages. In fact, offers from Fields and Underwood to execute releases upon the payment of $5,000 were not immediately rejected and only after Company management had had the opportunity to consider them. Although Thompson denied that he had threatened these men with discharge if they returned to their former jobs, he freely admitted that he had sought to induce them to waive their rights to reinstatement.

Thompson testified that Goodson did not desire to return to work at Threads and Goodson conceded that this was true. Goodson had then made tentative plans to move to Georgia and was apparently interested in securing funds to enable him to go into some kind of business. On his direct examination Goodson testified that Thompson threatened that he would again be fired if he were reinstated. On cross-examination Goodson's testimony as to threats was somewhat shaken and he admitted, in substance, that he had made his decision to accept money and waive his right to reinstatement uninfluenced by what any one had said to him.

Underwood testified that Thompson asked him: "What guarantee do you have that you won't be fired again, if you don't follow certain rules and regulations"? Fields testified positively that when Thompson first contacted him, Thompson offered him money which he refused, and then Thompson said: "Well, if you take your job back, McGuire or Bridges one will fire you again. * * * We don't want you fellows back down there in the plant." Fields further testified that he refused offers of money and told Thompson he wanted his job back and he would "let the Board handle it" although admitting that, at another meeting with Thompson, he offered to sign a release for $5,000, which offer was later refused. Thompson's version of the alleged threats was that he had told Goodson, Underwood and Fields that if they were reinstated they would be expected to observe and be governed by Company rules and regulations the same as all the other employees.

It is obvious that there is direct conflict in the testimony concerning Thompson's remarks. It was shown beyond

question that Thompson did not meet with these three discharged employees at their homes but arranged to meet with each one individually with no one present to overhear the conversations. The Examiner concluded that Thompson had carried on these negotiations in a furtive manner and rejected Thompson's denials of threats in the course of his persistent efforts to persuade Goodson, Fields and Underwood to waive reinstatement.

██ If we were to adopt even the most charitable view, we believe that, under the circumstances, the efforts of Thompson to persuade these discharged employees to release their rights to reinstatement were ill-advised and reprehensible. As stated by the Examiner, such right of a discriminatorily discharged employee to reinstatement and back pay is not a private right subject, like an ordinary debt, to private adjustment, but a remedy that is provided in the public interest in order to enforce a public right.[3] The Board decision and order provides, in pertinent part, as follows:

"For the reasons indicated in the Intermediate Report, we agree with the Trial Examiner that the respondent [Threads] violated Section 8(a) (1) of the Act by its attempts to bypass the processes of the Board and, buttressed by threats, to induce employees, previously unlawfully discharged, to waive their rights to reinstatement, * * *."

We find no reason to disturb this portion of the Board's decision.

██ The Examiner stated his *conclusion* that the Company, through Koppen's speech, proclaimed "to its employees that there would never be a union in the plant." It is apparent that Koppen did voice opposition to the union and the intention to use every *proper* means to prevent it from coming into the plant. But the Examiner did not find, or even attempt to find as a fact, that the Company made the declaration as last above quoted. This conclusion, unsupported by either evidence or finding of fact, cannot be sustained.

The Examiner *found and concluded* that the Company, through Koppen, proclaimed to its employees "that they would never derive any advantage from joining a union." What Koppen actually said, as indeed the Examiner originally noted, was: "Those who might join or belong to a union will never get any advantage or any preferred treatment of any sort over those who do not join or belong to any union." The meaning of this language is quite clear. No matter how it is twisted, it means nothing more than that which it plainly states, namely, the Company will not grant any favors to union members which are not available to nonmembers also. Actually, section 8(a) (3) of the Act imposes upon the Company the duty to enforce a policy of nondiscrimination in regard to any condition of employment.

██ The Examiner erred in finding and concluding that the Company engaged in an unfair labor practice by declaring "its unalterable opposition to the Union." Certainly the Act does not require that the Company favor the Union or that it refrain from opposing the Union, nor does it prohibit the Company from expressing its opposition to the Union. The Examiner makes the novel declaration that the Company violated the law by "proclaiming its innocence at the same time it decided not to resist the [Examiner's] findings" in a prior proceeding. It is not the law, so far as we are aware, that any person who suffers an adverse ruling from a judicial or an administrative agency forfeits the right

3. See Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 269, 61 S.Ct. 561, 84 L.Ed. 738 (1940); National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940); Agwilines, Inc. v. N. L. R. B., 87 F.2d 146, 150 (5th Cir. 1936); N. L. R. B. v. General Motors Corp., 116 F.2d 306, 312 (7th Cir. 1940); N. L. R. B. v. Prettyman, 117 F.2d 786, 792 (6th Cir. 1941); N. L. R. B. v. Newark Morning Ledger Co., 120 F.2d 262, 267, 137 A.L.R. 849 (3d Cir. 1941).

to assert his innocence by failing to appeal from such ruling.

Koppen's speech did not contain any discernible threat of reprisal or force, or promise of benefit, relating to protected union activities. What he said appears to be unqualifiedly privileged under the provisions of section 8(c) of the Act.[4] The Examiner finds and declares that Koppen stated that "none of [Company's] employees who join the Union would ever get any advantage of any sort out of it," thereby "proclaiming to [these] employees that there would never be a Union in the plant" and that "they would never derive any advantage from joining the Union." We find no support in the record for this "finding" of the Examiner.

One of the three Board members was of the opinion that Koppen's speech contained no unlawful implications. The General Counsel concedes in his brief that the speech standing alone "might perhaps be characterized as nothing more than a statement of the Company's opposition to the Union and of its legal position with regard to the uniform granting of benefits to members and nonmembers alike." Nevertheless, he seeks to sustain the finding of unlawfulness, *but upon a ground not considered by the Board*. Thus, after making only passing reference to the finding that the Company "informed the employees that they would obtain no advantage by joining the Union," the General Counsel proceeds to *find* and argue that the speech was unlawful on account of prior "unlawful interferences * * * and discriminatory discharges" and "particularly" because of Koppen's "statement that the Union would bring 'serious harm'" to Company employees. It is the Board's function to make findings and draw inferences therefrom. Moreover, as far

back as 1948 the Board itself declared that prior conduct of an employer does not transform protected free speech into unlawful and unprotected speech.[5]

The Examiner found that the Company interrogated Underwood, "one of its employees, concerning his personal note-taking on subjects of a non-confidential nature" and stated his conclusion that the Company thereby "interfered with, restrained and coerced its employees in violation of section 8(a) (1) of the Act." But the complaint contains no allegation that the Company unlawfully interrogated its employees in violation of section 8(a) (1). Evidence without a supporting allegation cannot serve as the basis of a determination of an unfair labor practice. The complaint did contain an allegation that the Company had discriminatorily promulgated and enforced a rule prohibiting note-taking within the plant but the Examiner himself dismissed that allegation. It appears to us that evidence introduced in support of the dismissed allegation may have served as the basis for the Examiner's last above-noted finding and conclusion. There is, however, another reason for rejecting this finding and conclusion of the Examiner. The Company's business is highly competitive. Its dyeing operation is dependent on thousands of highly secret formulas and the Company's business would be injured or destroyed if these formulas were to get into the hands of competitors. Accordingly, the Company had a long-standing rule that no one should copy these formulas or remove from the plant information relating thereto. It was shown at the hearing of this case that at hearings in prior cases it was clearly developed that Underwood had repeatedly and flagrantly violated this rule. He had admitted that he had written down complicated numbers

---

4. "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression con-

tains no threat of reprisal or force or promise of benefit." Labor Management Relations Act, 1947, 29 U.S.C.A. 158(c).

5. Tygart Sportswear Co., 77 N.L.R.B. 613; Mylan Sparta Co., Inc., 78 N.L.R.B. 1144.

and formulas and that he took all of his notes to his own home where he kept them. Upon his reinstatement, Underwood resumed his note-taking and it was testified that he was "taking notes and creating pandemonium in the department by having employees constantly run to [him] with messages and so on, which, in turn, [was] getting them away from their jobs and interfering with Underwood's work." Underwood admitted that he couldn't say that he had slowed down in his note-taking even after a warning which was given him in Plant Superintendent Eyeler's office after his reinstatement. The Examiner himself found Underwood's notes to be so "voluminous and complicated" that he classified Underwood as "the master note-taker in the dyehouse."

Evidence tending to support the Company's claim of right to limit or restrain such activities is entitled to consideration and it could not be assumed that Underwood, having been reinstated by order of the Board, was completely free to do as he pleased in the plant. In undertaking to prevent the Company from even interrogating Underwood about his activities, the Examiner went beyond reasonable bounds in invoking the protection of the Act.

The Examiner found that the Company "subjected its employees to surveillance with respect to their legitimate activities during their working hours" and concluded that the Company thereby "interfered with, restrained and coerced its employees in violation of section 8(a) (1) of the Act." Again, the Examiner fails to recognize that the Act does not protect all employee activities and mistakenly assumes that employees may do as they please during working hours, free from any employer restraint whatever. This misconception is graphically illustrated by the recommended order which would require the Company to "cease and desist from

"(a) Subjecting its discriminatorily discharged employees, or any other employees, to surveillance with respect to their legitimate activities during their working hours."

Assuredly, the Company had the right to observe all of the activities of all of its employees during working hours and to specify the employee activities for which it will or will not pay wages. With respect to this phase of the case, it is practically impossible to overlook the Examiner's injudicious handling of credibility issues.

Fields, one of the discharged employees, testified that prior to his first discharge, the dyehouse supervisors were "hardly ever" seen in the dyehouse but that after his reinstatement these supervisors did "very little" but stand or sit in the dyehouse and watch him. The Examiner fully credited Fields despite the fact that he was contradicted by no less than thirteen other witnesses.

Sosebee, a union member, termed "a union adherent" by the Examiner, and called as a witness by the General Counsel, testified that supervisors McGuire and Bridges performed their supervisory duties "about the same way" after Fields and Underwood were reinstated as they had before that time. Employees Abernathy, Costner, Jones, Hill, Froneberger and Steele, supervisors McGuire, Bridges, Hoffman, Koppen and Eyeler, and Personnel Manager Thompson all testified positively that no Company supervisors made any change in their supervision after Fields and Underwood were reinstated. Several of these witnesses described, without contradiction or impeachment, the regularly assigned and required technical duties performed by supervisors Bridges and McGuire. They testified to undisputed and uncontradicted *facts* which reasonably established that McGuire and Bridges were required to spend approximately one-half of their time in the dyehouse office and the remaining one-half at various jobs which kept them so busy that it would be impossible for them to stop for any substantial length of time and gaze at employees, as Fields contended.

The Examiner discredits all of the many witnesses who contradicted Fields

upon the inaccurate claim that a "majority" [6] of them were "shown to have an interest which would bias them in favor of the [Company]." Ignoring evidence to the effect that union witness employees were neglecting their work and interfering with the work of others in making a written record of dyehouse activities, the Examiner stated that if the Company nonsupervisory witnesses "were really engaged in watching Fields and Bridges to the extent that is implicit in their testimony, they should themselves have been discharged for neglecting their work." Not wholly without justification counsel for the Company describes this as "judicial determination of a most remarkable nature!"

■■■ The Board seeks illegally to invade the Company's managerial prerogatives by directing the Company to refrain from what the Board terms "excessive," but at the same time *nondiscriminatory,* observation of the "legitimate activities" of its employees "during working hours." It seeks to direct the Company not to interfere with what was shown to be an elaborate spy system set up and maintained by a handful of its employees in the dyehouse during working hours, a system which included use of a "master note-taker" and reporters whose spying activities disturbed the operation of the dyehouse. The order would even prohibit the Company from questioning these employees about such activities, although in taking these notes one employee removed Company trade secrets from the plant in violation of an important and a valid Company rule. Absent discrimination,[7] it is the prerogative of the Company and not of the Board to determine what constitutes interference with employee performance during working hours in the Company's plant.

### The Discharge of Bell

Bell was employed by the Company in March 1959 as a general purpose dyeing machine operator. He identified himself as a supporter of the Union as early as October 1959 when he testified in the earlier complaint cases.

On March 10, 1960, long after he was identified as a Union adherent, Bell dumped buckets of wrong dye into a machine filled with special and expensive warps of yarn. This mistake caused damage in excess of $600. There is no conflict in the testimony regarding this incident. In Bell's own words he admitted, "I expect you could say it was my mistake, my neglect." However, he was reprimanded but not disciplined for this carelessness.

About one month before he was discharged, Bell repeated by starting another batch of yarn through the wrong process. Bell admitted that this "wasn't anything but [my] neglect," and stated that his supervisor still gave him "another chance."

At the hearing it was stipulated by General Counsel and Threads that "if there is nothing to be done about his machine," a dyeing machine operator "is authorized, without specifically requesting a break, to take a break, which normally runs between 10 and 15 minutes; that even though his machines do not need attention, * * * even for an unlimited period, still the break is the same—*he is supposed to be at his machine watching it in operation."* (Emphasis supplied.) Failure to watch these machines in operation can result in severe damage to them or the yarn being processed in them.

On the first of the occasions of misdyeing, McGuire warned Bell to "stay around his machines more." Later, on April 19, according to McGuire, he observed that Bell was away from his machines for forty minutes in a period of one hour. Even then, McGuire did not discharge him but warned him "for the last time." On or about April 25, approximately four days after Fields was reinstated, Bell was reprimanded by Per-

---

6. Two of the nonsupervisory witnesses were shown to be related by marriage to two of the foremen.

7. There was no contention that Company actions concerning Underwood's note-taking constituted discrimination.

sonnel Manager Thompson for taking excessive breaks. According to supervisor Bridges, he noticed Bell's excessive absences from his machines and warned him once, four to six weeks before his discharge, and again on the evening of his discharge. Both of these occurrences were reported by Bridges to McGuire. There is no suggestion from Bell, the Examiner or the Board that these reprimands were undeserved or unjustified or that they were in any way precipitated or motivated by antiunion animus on the part of the Company.

The foregoing uncontradicted evidence naturally raises the question—why was the Company so tolerant in the face of this repeated misconduct when the Company knew all the while that Bell was a union adherent? The answer may reasonably be found in Thompson's and McGuire's testimony. According to Thompson, Bell "said blatantly [that he] wanted to show people that nobody could tell him anything"; that Bell "dared someone to do something" and "would not cooperate in any manner." Thompson and McGuire testified that McGuire, nevertheless, "bent over backwards" in an effort to avoid discharging Bell and thus spare the Company the necessity of defending an unfair labor practice case such as this.

On May 31 McGuire again found that Bell was away from his machines for forty minutes in a one hour period and discharged him. Bell admitted, and the Examiner found, that Bell had been reprimanded for being away from his machines too much and that the North Carolina Employment Security Commission, after formal contested hearing, had penalized Bell on the basis of its finding that his absences from his machines were excessive. Bell further admitted that the Commission's decision "could have been [right]." The Examiner credited the bulk of this evidence and did not reject

or attempt to discredit any of it except the Company's explanation as to why it had tolerated Bell's misconduct.

In seeking a plausible basis for a finding favorable to Bell, the Examiner exhibits confusion. He first condemns McGuire for watching "Bell more extensively than Bridges watched Fields," (a claim unsupported by any evidence in the record), thus supplying himself with "better information concerning Bell's derelictions." He remarks that "much to the subsequent regret of the Respondent's [Company's] executives, [Bell] was not fired" for pouring the wrong dye in his machine. In any event, says the Examiner, this was "the sort of mistake which was not too uncommon in the dyehouse." [8]

Bell testified that, on the day of Fields' discharge, he had noted on a piece of paper that employees Costner and Abernathy were away from their machines. There was no evidence and no contention that this alleged note-taking ever came to the attention of the Company supervisors. The Examiner supposes, nevertheless, that Bell's "note-taking * * * could hardly have failed to come to the attention of the Respondent's executives" and reaches the absurd conclusion that "in Bell's role as a note-taker is to be found the reason for his discharge." The Examiner's suspicions certainly provide no legal support for a finding against the Company. The Board, upon review, recognized that the Examiner reached his conclusion through a pyramiding of fallacies, rejected the Examiner's decision and "does not rely on" his rationale in arriving at its own determination that Bell was unlawfully discharged. Instead, the Board asserts that "Respondent's other unfair labor practices" furnished a sufficient basis for a finding that the Company *"utilized Bell's absences from his machine as a pretext* and that it discharged him because of

8. This finding is based on McGuire's testimony that mistakes in dyeing sometimes result from errors made "by the men in the drug room." This testimony does not support any conclusion that it is "not too uncommon" for a *dye machine operator* to make the kind of mistakes which Bell made.

his union adherence." (Emphasis supplied.)

Thus the Board undertook to impose a double standard as to the value of "background evidence." On the one hand, throughout its order, the Board emphasized all of the elaborately detailed background evidence which it considered to be adverse to the Company's position and favorable to the Union's position. But, on the other hand, when the Company showed that it had tolerated Bell's misconduct, carelessness and disobedience for a long time after learning of his union affiliation and adherence, the Board lightly dismissed all such evidence with the statement: *"The fact that Bell damaged property or committed derelictions on other earlier occasions is immaterial as the Respondent [Company] did not purport to discharge him for any such alleged misconduct."* (Emphasis supplied.)

But, what is much more serious and disturbing, the Board has either overlooked or ignored the admonition of this court that there is no legal basis for finding that the assigned reason for a discharge is nothing but a "pretext" where it is shown, as here, that prior misconduct of an employee was tolerated under circumstances which negate any idea that the employer was searching for some false reason to discharge the employee on account of his union activities. In Martel Mills Corp. v. National Labor Relations Board, 114 F.2d 624, 632 (4th Cir. 1940), this court stated:

" * * * Had the Martel Mills desired to discharge Whittle for his union affiliations, it could very easily have selected one of the occasions when Whittle had violated the company rules or one of the occasions when his fellow-workers complained of his actions. Instead, it allowed these complaints and disturbances to accumulate until a time when the record of the individual employee served as one of the bases for maintaining or discharging him. Whittle's record did not merit for him

any favorable consideration. On the contrary, it gave indication that the employer would use the first convenient opportunity to rid itself of the undesirable employee. That Whittle was discharged instead of laid off does not evoke surprise or suspicion."

Later, in National Labor Relations Board v. United Brass Works, Inc., 287 F.2d 689, 693 (4th Cir. 1961), we stated:

"So it can be said in the instant case that York's employment record supplied good cause for discharge. The Company had abundant justification for terminating York as an unsatisfactory employee and, upon this record, one need go no further than the testimony of the discharged employee himself to discover the circumstances leading up to and motivating his release. That York was a union member and an active movant in the organizational drive will not shield him from release for good cause. * * * If discrimination may be inferred from mere participation in union organization and activity followed by a discharge, that inference disappears when a reasonable explanation is presented to show that it was not a discharge for union membership. * * * ".

### Discharge of Leonard Fields

Fields was reinstated on April 21, 1960, pursuant to Board order and was again discharged three weeks later. During that period he was doing the same work and operating the same kind of dyeing machines as before his first discharge.

Fields was present during Koppen's speech to the dyehouse employees and he was told that the reinstated employees would be expected to abide by all Company rules and regulations just as other employees. The rule against excessive breaks, as stipulated at the hearing, has been discussed.

The evidence as to the circumstances of Fields' second discharge is conflicting.

The Examiner accepted Fields' testimony and the testimony of corroborating witnesses with respect to these circumstances.

Fields was working on the shift which began at three o'clock in the afternoon. Before five-thirty he had taken a break to eat a lunch but had eaten at his machines and he admitted that he had taken one other break. Shortly before five-thirty he had put into his machine a yarn which had twenty minutes "to run" and his other machine was "caught up to 30 minutes." Employee Sosebee suggested that they go out for a smoke and the two of them walked out to a point only three or four feet outside the door from which Fields could see his machines. There they were joined by another dyehouse employee, Teague. After five to ten minutes Fields and Sosebee started to return to their jobs, but when Fields had nearly reached his machines Bridges met him and said to him: "Looks like I am going to have to let you go again." Fields asked: "What for this time"? Bridges replied: "Well you are staying away from your job too much." Fields protested: "Well, you can check my production, you can check the charts and see that my machines have been running exactly right." Bridges told him: "I am not talking about your production, your production is all right. You are just staying away from your job too long."

As Fields explained, he had taken fewer breaks since his reinstatement than before his first discharge "because I knew they was watching me, and I knew what Mr. Thompson said, and I figured they would do what they had said they would do." Moreover, he had received no complaints, prior to his second discharge, that his absences from his machines were excessive. The following morning Fields went to see Thompson and suggested that his production be checked but he received the same comment from Thompson as he had received from Bridges, namely, that the question was not his production but staying away from his job too much and Thompson added: "We have to take Bridges' word for it." As Fields left his office he said to Thompson: "You are going to do what you said you'd do." When Thompson asked: "What was that"?, Fields replied: "You said you would fire me and Underwood if we came back in, and it looks like that is what you are doing, it looks like." Thereupon Fields left and went home.

Teague and Sosebee, both adherents of the union, were called to corroborate Fields' testimony and they testified that the time they spent in smoking immediately prior to Fields' discharge had not exceeded ten minutes.

The Company stressed the fact that on occasions following his reinstatement, Fields had gone from the dyehouse into the mercerizing department in violation of a rule that employees in one department should not go into another department except on business. Fields admitted that he might have gone into the mercerizing department on two or three occasions to the drinking fountain and might have chatted briefly with employees in that department. The Company countered that there was a drinking fountain in the dyehouse which was closer to Fields' machines than the one in the other department. There is no evidence, however, that this matter was called to Fields' attention or that he was cautioned by anyone.

In view of the threats of discharge which were found to have been made prior to Fields' reinstatement, all the circumstances surrounding the discharge and Fields' union adherence, the Examiner and the Board determined that the discharge was discriminatory and in violation of the Act. We find support for this determination in the record as a whole.

In summary, we hold: (1) That sections (a) and (d) of the Board's cease and desist order should be enforced and enforcement of sections (b) and (c) should be denied; (see footnote 1, supra); (2) that the order of reinstatement of Leonard Fields, and other provisions relating to loss of pay and the furnishing of pertinent records should

be enforced; (3) that enforcement of the order of reinstatement of William F. Bell should be denied; (4) that it is appropriate to require the posting of a notice (at the Company plant) consistent with the views herein expressed.

Enforcement granted in part and denied in part.