**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MINUTE MAID CORPORATION, Respondent.**

No. 18092.

United States Court of Appeals
Fifth Circuit.

Nov. 9, 1960.

Paul J. Spielberg, Atty., Thomas J. McDermott, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Duane B. Beeson, Attys., N. L. R. B., Washington, D. C., for petitioner.

Theo. Hamilton, Jacksonville, Fla., Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

In December of 1954, the Respondent, Minute Maid Corporation, acquired a plant at Auburndale, Florida, for the manufacture of frozen citrus concentrate which was shipped, in substantial quantities, in interstate commerce. Minute Maid also owned about 15,000 acres of producing citrus groves. At the time of the acquisition of the plant by Minute Maid there was a contract between the Respondent's predecessor and Citrus Workers Local Union 24218, an A F L affiliate. Minute Maid recognized this union and negotiated contracts with it. The Teamsters Union, disregarding the existing contract between Minute Maid and the Citrus Workers Union, carried its campaign of attempting to organize the workers in the citrus industry [1] into the Auburndale, Florida, plant of Minute Maid. The Teamsters Union convinced the National Labor Relations Board that it was entitled to recognition. Minute Maid Corporation, 117 N L R B 68. The Union, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Cannery, Citrus Workers, Drivers, Warehousemen and Allied Employees, Local 444, was certified as the bargaining agent of an employee unit composed of all production and maintenance employees, including warehousemen, checkers, cafeteria employees, leadmen and peel oil operators.

Bargaining sessions were held on fourteen occasions at irregular intervals between April 9, 1957, and November 6, 1957. As to some issues, both Union and the Respondent made concessions that narrowed, if not entirely closing, the gap between them. On other questions each declared a position which was unacceptable to the other and neither showed any disposition to yield. The attorney and chief negotiator for the Respondent lived in Jacksonville, Florida. The Chairman of the Union's eight-man negotiating team had his residence in Texas. Others lived at places distant from Lakeland, Florida, which was the agreed site of the negotiations. In October the Union submitted its "final draft". This was rejected by the Respondent which tendered, in November, its "final proposal." On December 11 the Union sent the respondent a telegram saying that the Union membership had "soundly rejected" the Respondent's last proposal. Such was the

1. See Florida Citrus Canners Cooperative, 124 N.L.R.B. No. 163; Adams Packing Association, Inc., 123 N.L.R.B. No. 132.

stalemated status of the collective bargaining processes between Union and employer on the evening of December 11, 1957. The employer had disapproved the final contract draft of the Union, and the Union had rejected the employer's final proposal.

On the night of December 11, and again on the night of December 12, the citrus regions of Florida were subjected to freezes of the greatest severity that had been experienced since the beginning of frozen concentrate production. It was then feared by the processors of concentrates that the effects of the freeze upon their business would be disastrous. It was not then known whether the manufacturers of concentrates would be permitted to use frozen fruit, nor was it known how much of the fruit had been frozen. Minute Maid, as a grower as well as a processor, was in a position of greater peril than its competitors who were not grove operators. On December 13, Minute Maid telegraphed the Union saying that since the Union had rejected Minute Maid's proposal and because of the freeze creating new problems which made operational conditions unpredictable, the Respondent's proposal was withdrawn. On December 19 the parties met and at the meeting Minute Maid handed the representatives of the Union a written communication [2] requesting the Union to defer decisions regarding contract

negotiations until the effect of the freezes could be evaluated and this it thought could be done by January 16, 1958.

The Union declined to allow the Respondent the time it needed, or thought it needed, to ascertain the effect of the freezes. On the night of January 8 there was another freeze, and promptly thereafter, on January 9, 1958, the Union submitted a "last and final proposal" and made the threat that unless the proposal was accepted it "would take such action as may be necessary to bring the issues to a conclusion." A further freeze occurred on January 9, and still others on February 4 and February 5. At the request of Minute Maid a meeting was held on February 6. A further meeting was held on February 13. At these meetings consideration was given to many of the various non-wage proposals which had been previously made by either the Union or the employer. At these meetings discussions were had with a minimum of acrimony, progress was made, agreements with respect to some matters were reached, and no ultimatums were delivered. On February 13, at the conclusion of what was described by the Petitioner's Examiner as "a busy day for both parties," it was agreed that there should be another meeting on February 26. There were succeeding freezes on February 14, February 18, and February 21.

The Florida Citrus Commission, an agency of the State of Florida, is created

**2.** "Minute Maid would like the Teamsters' officials and the negotiating committee to fully understand the position we are taking in our negotiations and the reasons.

"Before we made our offer of 8-½c an hour increase, we had given very careful study to the prevailing Industry wage rates, and most of all to our own circumstances. Our findings were reflected in the wage increase we proposed at that time with our explanation to you it was the best we could offer and still have reasonable assurance of a satisfactory operation.

"Since December 11, 1957, when your Union officially rejected the Company proposal, Minute Maid and the entire Citrus Industry has suffered a severe and crippling freeze. Neither Minute Maid nor anyone else is in a position to

accurately forecast at this time what the ultimate results of this freeze will be. It is, however, generally the opinion of leaders in this Industry that an alarming reduction of processing is imminent. We are faced with a struggle for survival; and even an attempt to forecast or plan for the immediate future is completely unrealistic until more facts are developed.

"We are asking the Union to delay any final decisions regarding our negotiations until Minute Maid can evaluate the ultimate effect which this freeze will have on our operations this season. Approximately January 16, 1958, Minute Maid should be in a position to meet again with the Union for further discussions with the hope that we can then reach a mutually acceptable agreement."

and empowered by statute [3] to regulate the citrus industry. After the first freeze in December 1957 and at frequent intervals thereafter the Commission met and evolved a day-to-day program intended to permit the concentrate producers to market a product if and when, and to the extent that, this could be done without a lowering of acceptable standards of quality. At the outset there was an embargo. This was followed by restrictions on the use of frozen fruits. After a brief time, manufacturers were permitted to resume the making of citrus concentrate but were required to hold it in bulk pending a determination as to whether or not it could be canned and marketed. The freezes resulted in damage to the citrus crop and caused doubts as to the business prospects in the near future of those who were growing, processing and marketing the fruit and its products. Because the citrus concentrate industry was without prior experience in the use of frozen fruit, there was an uncertainty as to the extent by which the operations would be curtailed by reason of the freezes.

As this critical time wore on it was ascertained that, within a certain tolerance range, citrus fruits could be used in the making of concentrate and that the product was of a quality available for canning and marketing. Gradually the outlook for the season's business became less dark and by the latter part of February it seemed apparent that Minute Maid would have a satisfactory season at its Auburndale plant.

On January 14, 1958, the Union filed with the Board a charge against Minute Maid that on and after October 7, 1957, the Company had refused to bargain with the Union. On February 21, 1958, a year and a day after the Union had been certified as a bargaining agent, a petition was filed with the Board by 141 of the 208 employees in the bargaining unit, repudiating the Teamsters Union and requesting its decertification. Notices of a hearing on the decertification petition were given and, after several postponements, the Board's Regional Director, on June 9, without a hearing, advised that because a charge was pending against the employer the decertification petition had been dismissed. The dismissal was sustained by the Board. Meanwhile Minute Maid had advised the Union that it could not continue bargaining with the Union until the question of representation was settled. The meeting scheduled for February 26 was called off. The Union requested further meetings and the employer adhered to its stated position that it could not bargain with a union which did not represent a majority of the employees. On April 18, 1958, the Respondent notified the employees that bonus payments to them would be made. The bonuses were paid in May and June. The Board's General Counsel issued a complaint and notice of hearing on July 3, 1958, based upon the Union's charge of January 16, 1958, and an amendment to the charge of April 22, 1958. It will be noted that no complaint was filed until more than four months after the employees' decertification petition had been filed and more than three weeks after the employees' petition for decertification had been dismissed without any investigation or hearing.

As stated in the Board's brief,

"[T]he Board found as a matter of fact that the Company's conduct following December 13, 1957, when it withdrew its November proposal and declined further to discuss economic matters, was not pursued in good faith, i.e. that the Company had adopted a fixed intention not to reach any agreement with the Union * * * but rather * * * to frustrate the whole bargaining process. It also found that, independently of the Company's bad faith, its withdrawal on and after December 19, 1957, from negotiations over economic matters, and its insistence upon treating any agreement reached as to non-economic matters as tenta-

3. Fla.Stat.1959, § 601.01 et seq., F.S.A.

tive only, constituted in essence a refusal to bargain altogether. Finding further that such a refusal to bargain is not permitted by the Act on the basis of economic expediency, the Board rejected the contention that the uncertainty in the Company's position engendered by the winter freeze excused the Company's declination to bargain for the period in excess of two months here involved. Finally, the Board found that the Company's withdrawal of recognition from the Union on February 24, 1958, and its unilateral grant of a bonus to its employees in April 1958 also were violative of Sections 8(a) (5) and (1) of the Act [29 U.S.C.A. § 158(a) (1, 5) ], rejecting the Company's argument that it was free to act on its own in view of the claim of a loss of employee support for the Union. The Board ruled that any such loss of support could not affect the Union's representative status in view of the Company's preceding unfair labor practice conduct which necessarily affected the Union sympathies of the employees."

The Board entered its order directing Minute Maid to cease and desist from the unfair labor practices as found by the Board, to bargain with the Union upon request, and to post notices. In the proceeding before this Court the Board seeks enforcement of its order.

 The parties are not in accord as to how the questions which are before us for determination should be stated. The primary issue, broadly stated, is whether or not there is substantial evidence on the record, considered as a whole, to support the Board's finding that Minute Maid refused to bargain in good faith with the Union. There is also the question, perhaps embraced in the initial question, as to whether, if Minute Maid was under a duty to bargain at the time of the filing of the decertification peti-

tion, it was then or thereafter, upon the dismissal of the petition, relieved of the duty to bargain.

There is not, we conclude, substantial evidence on the record, considered as a whole, to support the Board's finding that Minute Maid's refusal to discuss economic matters during the interval following the freezes was not in good faith, but was to frustrate the bargaining process. Minute Maid's bargaining conduct prior to the first of the severe and damaging freezes is, it seems, accepted as being in good faith. The Florida Citrus Commission was not able to determine the effect of the freeze, which was the first of major consequence since the development of the concentrate industry, and so the Commission placed an embargo on the use of frozen fruit. To say that Minute Maid should have been required, at that time, to bargain on economic matters would be to attribute to it, as of that time, a knowledge of the extent of the freeze damage and a power of making an accurate prophecy that it would be permitted to use frozen fruit within then determinable limits. We will not assume that Minute Maid was gifted with a clairvoyance not possessed by the Commission whose motives are not challenged and whose credibility is not impugned. The doubts and uncertainties then existing were, to be sure, ultimately resolved and it ultimately developed that the resulting conditions were much less of a disaster than had been feared. The Board's Examiner and the Board itself, relying on hindsight[4] rather than viewing the situation as it appeared to Minute Maid and as it must have appeared to the Union during the period of uncertainty, concluded that the unwillingness to bargain at that time on economic matters was not in good faith. We are unable to see, in the record, evidence of facts which would justify such an inference. Neither the Board nor the Court should indulge in second-guessing. N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406.

---

4. "You know a man's foresight ain't as good as his hind sights." C. H. Smith, Bill Arp (1866), 130.

The Board takes the position, an anomalous one it seems to us, that even though the freezes had created such economic uncertainties as prevented Minute Maid from knowing what it might be able to do with respect to such questions, nevertheless bargaining with the Union on such issues should have continued. The Board suggests that an agreement might possibly have been reached for continuing existing terms of employment and a reopening after the effects of the freezes were known. The Board also suggests that alternative contract proposals might have been framed conditioned upon differing outcomes of the effect of the freezes. And again, says the Board, if the employer felt that it was unable to make wage commitments until the uncertainties resulting from the freezes should be dispelled, it should have undertaken to bargain for delay. These suggestions, advanced to justify the determination that the unwillingness to discuss economic matters until the effects of the freezes upon the Company's economy were known was a refusal to bargain in good faith, seem most persuasive as requiring a conclusion that failure to bargain in good faith had not been demonstrated by Minute Maid's action. We can see no reason for saying that Minute Maid should have been required to bargain for a delay when the unwillingness of the Union negotiators to defer economic discussions had been so positively declared.

■ From the uncontradicted facts it appears that the apprehensions regarding the effects of the freezes had been so far put at rest by the latter part of February that this reason for declining to bargain on economic matters was no longer available to Minute Maid. The evidence does not justify a conclusion that refusal to bargain on such questions at an earlier date would have been a bad faith refusal. After a union has been recognized or certified as the bargaining agent of employees, the employer is confronted with the maxim, caveat actor, if he refuses to bargain with the union on the ground that the union no longer represents a majority of the employees.

N. L. R. B. v. Lambert, 5 Cir., 1954, 211 F.2d 91; Cone Brothers Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, certiorari denied 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122; N. L. R. B. v. Dan River Mills, Inc., 5 Cir., 1960, 274 F.2d 381. But if the employer takes the position that the union has lost its majority, and if it is determined that the position is correct and that the loss of majority was not attributable to unfair labor practices of the employer, then justification for the refusal to bargain has been established. N. L. R. B. v. Dan River Mills, Inc., supra. Cf. N. L. R. B. v. Lambert, supra. The union cannot avoid the consequences of a loss of representation by the mere filing of an unfair practices charge against the employer. Nor is the Board relieved of its duty to consider and act upon an application for decertification for the sole reason that an unproved charge of an unfair practice has been made against the employer. To hold otherwise would put the union in a position where it could effectively thwart the statutory provisions permitting a decertification when a majority is no longer represented. N. L. R. B. v. Dan River Mills, Inc., supra; Rothenberg on Labor Relations 526 et seq. Here, as in the Dan River Mills case, it was reasonable for the employer to assume that its good faith doubt concerning the Union's majority would be resolved. The Board's wrongful refusal to act upon the decertification petition should not put Minute Maid in a position of refusing to bargain in good faith. The Board suggests that Minute Maid should have discussed with the Union the question of the Union's majority. This question is a fact question; it is a question which the Board is required to determine. It is not something to be bargained. See N. L. R. B. v. Dan River Mills, Inc., supra.

■■ The payment by Minute Maid of bonuses to the employees is found by the Board as an unfair labor practice. We have no doubt but that an employer may be guilty of an unfair labor practice by a unilateral wage increase or the payment of a bonus during the time when

the employees are represented by a union as their bargaining agent. We think it is clear that if the employees are not represented by a collective bargaining agent, a company may grant a unilateral wage increase or pay a bonus without necessarily being charged with an unfair labor practice. We do not disagree that the unilateral payment of a bonus while the employees are represented by a union may tend to discourage continued union membership and so tend to lessen the union membership. Here, however, the bonus was not declared until after the Union had, apparently, lost its majority and the employer had declared its unwillingness to treat with a union which did not have a majority. The payment of the bonus did not, in any manner, affect the question as to whether the Union had lost its majority when the decertification petition was filed. We do not think that the Board, by delaying action upon the decertification petition of a substantial majority of the employees and subsequently dismissing without passing upon the petition, should be permitted to put the employer in violation of the Act. In the absence of a ruling upon the decertification petition, which ruling the Board did not make, and under the particular situation shown by the uncontroverted facts here existing, we conclude the bonus payment was not a violation. What we decide is not in conflict with N. L. R. B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243; Id., 5 Cir., 272 F.2d 773.

Other matters, minor in character, are referred to by the Board as supporting the finding that the respondent refused to bargain in good faith. The withdrawal of proposals made and agreed upon may be mentioned. The making and withdrawal of proposals and the granting and receding from concessions, without justifiable cause, may be evidence of refusal to bargain in good faith. But, where circumstances arise pending discussions which call for a reconsideration of a proposal or concession, absence of good faith is not shown by a reopening of the question. As the Board has said in its brief, "Proposals could be withdrawn and new ones offered to meet the changed circumstances." As we view the Board's decision, we become convinced that its attitude and approach are permeated with the unjustified notion that Minute Maid's acts and conduct, from the time of the first of the freezes, were governed by an intention not to reach an agreement with the Union. Disagreeing, as we do, with the Board's determination that Minute Maid has committed unfair labor practices, the enforcement of its order is

Denied.