NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SATILLA RURAL ELECTRIC MEMBER-SHIP CORPORATION, Respondent.

No. 20118.

United States Court of Appeals
Fifth Circuit.

July 26, 1963.

1. Bugg v. SS Pacific Ranger, etc., U.S.D.C.S.D.Tex., Admiralty # 283, July 27, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Stuart Broad, Atty., Stuart Rothman, Gen. Counsel, Melvin Pollack, Atty., N.L.R.B., Washington D. C., for petitioner.

E. Kontz, Bennett, Waycross, Ga., Bennett, Pedrick & Bennett, Waycross, Ga., of counsel, for respondent.

Before TUTTLE, Chief Judge, JONES, Circuit Judge, and DeVANE, District Judge.

TUTTLE, Chief Judge.

This is a petition by the Board for enforcement of an order issued against respondent, Satilla Rural Electric Membership Corporation, requiring it to bargain in good faith with the Union which had been duly certified as the bargaining agent of the Company. The basic facts are not in disagreement.

On February 24, 1961, following an election, the Board certified the Union as the bargaining agent of the Company's electricians, linemen and other hourly paid employees. On March 25, 1961, negotiators for the Company and the Union discussed a proposed contract submitted by the Union, and, on May 5, the parties discussed a proposed contract submitted by the Company. On June 16, 1961, a third meeting was held, at which the Company tendered a complete contract proposal for the Union's acceptance. On July 1st, under the existing labor policy, or "plan" of employment, the employees were entitled to a "scheduled semiannual raise." This raise was not put into effect on the ground, as stated by the respondent, that the negotiation proceedings were pending. Other employees not represented by the negotiators of the Union did receive their regular July 1st semiannual raise. On August 1st an additional discussion was held, but no agreement was reached. At this time there was a substantial difference between the parties on the wage scale and seniority provisions. In the meantime, although the Federal conciliator and the negotiator for the Union stated that it would not be a violation of the Act for the Company to continue the regularly scheduled wage increases, the Company did not put these into effect until September, 1961, after the Company had declared an impasse. At a final meeting on August 21st, a Company attorney advised the Union negotiator that the Company's Board of Directors had rejected the August 1st proposal, and he then produced a document signed by a majority of the employees in the bargaining unit, which recited that these employees were not union members, that they were satisfied with the Company's wage and hour policy, and that the Union has been "a damage to our personal welfare insofar as wages and working conditions are concerned." The Company's representative commented that the Union was in a weak position to continue negotiations as the employees' bargaining representative, but said he would submit any further Union proposal to the Company's Board of Directors. Thereafter, the Union mailed to the Company a proposed contract identical with the contract offered by the Company on June 16th, which it had later withdrawn. The Company did not reply, but on September

4th posted a notice advising the employees that the Company had rejected the Union's latest proposal, and, as the Union had been repudiated by "a majority of the eligible employees," that "job evaluation [would begin] as soon as possible \* \* \* and when such work is complete [pay raises] would be given [retroactive to July 1, 1961,] as normally scheduled." These increases were granted in October retroactively effective to July 1st. The Union later, on September 15th and November 9th, requested the Company to fix dates for further negotiations. The Company has thus far failed to do so.

Under the circumstances of this case, it would appear that the Board need not accept the respondent's characterization of the Union's final effort to accept the contract offered by the Company, that is, that it was a "trick" by the Union and was not an offer made in good faith. It was the primary duty of the Board to determine as a fact whether respondent was acting in good faith, or whether its actions amounted to a mere superficial pretense at bargaining. As the Seventh Circuit has said:

> "We think the Board had full authority to determine as a fact whether petitioner was acting in good faith \* \* \* whether it had actually the intent to bargain, sincerely and earnestly,—whether the negotiations were captious and accompanied by an active purpose and intent to defeat or obstruct real bargaining." Singer Mfg. Co. v. N. L. R. B., 119 F.2d 131, 134 (7th Cir.), cert. denied, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549 (1941).

■ We cannot determine that the Board did not have ample basis on this record of relatively short bargaining accompanied by the Company's passing up a "regularly scheduled wage increase" during the course of the bargaining on which to base its finding that there was not here the minimum required by the law—that is that the parties bargain in good faith. Moreover, while it is not an absolute rule without exception that once a certification is made the Union's representative must continue to be recognized for at least a year, see N.L.R.B. v. Florida Citrus Canners Cooperative, 5 Cir., 288 F.2d 630, nevertheless it is also true that the Company is not relieved of its duty to bargain with a Union within the certification year merely because a majority of employees may have defected from the Union. See Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125.

■ We conclude that the Board was adequately justified on this record to enter its order requiring the respondent to bargain collectively in good faith with the Union until it is clear that a contract can be agreed upon or that a true impasse has occurred.

The order will be enforced.