NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WARRENSBURG BOARD & PAPER CORPORATION, Respondent.

No. 6, Docket 28735.

United States Court of Appeals Second Circuit.

Argued Sept. 25, 1964.

Decided Jan. 5, 1965.

in Warrensburg, New York, where the Company is engaged in the manufacture and sale of paperboard and related products and because the Respondent is engaged in commerce within the meaning of the Act. We hold that the Board's findings are supported by substantial evidence on the record as a whole and accordingly enforce the Board's order.

On June 16, 1961, the Union, United Paper Makers and Paper Workers AFL-CIO, following a program of recruitment among the Respondent's employees, petitioned the Board for an election. Respondent objected to allegedly illegal methods used by the Union to obtain signed membership cards, but the Regional Office of the Board made no investigation into the merits of the complaint, and on August 11 the Company consented to an election. The Union won by a vote of 15 to 14, and within a week Respondent wrote to the Regional Director of the Board to object to claimed irregularities in the voting. In his Report on Objections, the Regional Director overruled the Company's claims because the Respondent had neglected to serve copies of these objections on the Union as required. Shortly thereafter, Respondent filed with the Board a request for extension of time for filing exceptions to the Regional Director's Report, neglecting this time, however, to submit proof of service on the Union. The Board, on October 4, after advising Respondent to no avail that proof of service was requisite to the granting of Respondent's request, certified the Union as the exclusive collective bargaining representative of the employees.

Following a preliminary meeting on December 15, 1961, at which the Union submitted a proposed contract, the parties met four times, discussing various provisions of the contract on January 15, February 12, and March 8 and 16. In the course of the first three meetings, the Union succeeded in most of its major demands, gaining agreement to an employee insurance plan, a Union bulletin board, free access to the mill to contact employees, grievance discussion rights,

Duane R. Batista, Attorney, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Attorney, N.L.R.B. on the brief), for petitioner.

Irving T. Bergman, New York City, for respondent.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

SMITH, Circuit Judge:

The National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act petitions for enforcement of its order issued on July 3, 1963 against Respondent, Warrensburg Board & Paper Corporation. The Board found that the Respondent had violated § 8(a) (1) and (5) of the Act by refusing to sign an agreement embodying orally agreed-upon terms and conditions of employment. No jurisdictional issue is presented because the claimed unfair labor practices occurred

and wage increases. A two year contract, incorporating these concessions, was tentatively agreed upon. The last meeting was scheduled for the sole purpose of attempting to resolve a disagreement on the Union security issue; however, considerable confusion arose with regard to how that issue was finally settled. The Trial Examiner determined that the parties agreed to hold a secret ballot vote among the employees permitting them to choose between a membership or union shop, in either case with a 30-day escape period. A union shop provision with a 30-day escape clause was interpreted by the Board to mean that all employees who did not withdraw from membership during the escape period had to remain members, and that all new employees would automatically become members. The Respondent claims that the Union agreed, in assenting to the 30-day escape clause, that it would make no claim to represent the employees and would waive its rights following certification of the Union if the Union did not represent a majority of the employees at the end of the escape period.

At a meeting on March 31, the employees, by a single vote margin, voted in favor of the modified union shop provision. Between April 1 and May 1, 25 of the Respondent's 29 employees signed withdrawals from the Union, as they were permitted to do under the 30-day escape clause. Claiming that the employees had by their widespread defection rejected the Union, the Respondent refused to sign the contract.

The Board concluded on the basis of these facts that the Company had violated § 8(a) (1) and (5) of the Act by refusing to sign a collective bargaining contract embodying agreed-upon terms and conditions of employment. Accordingly, the Board ordered the Respondent to cease and desist from the commission of this unfair labor practice and from in any like or related manner interfering with the rights guaranteed its employees under Section 7 of the Act. Respondent was further ordered to execute the contract submitted to it by the Union, with an effective terminal date of March 1, 1964, if the Union requested that it be signed. If no such request was made, Respondent was ordered to bargain with the Union and to embody any understanding in a written agreement. In any case, Respondent was required to post an appropriate notice.

■ Clearly the Board had the authority to issue the orders and to make the findings that it did. Respondent's contention that the Board acted improperly in accepting the finding made by the Trial Examiner as to the meaning of the 30-day escape clause is completely without merit. The Trial Examiner determined that the parties by including that provision did not intend in any way to terminate their association in the event that more than a majority of the employees withdrew from the Union. Although there was conflicting testimony on this issue, we have held in the past that questions of credibility are for the trier of fact and that we will not upset the decision of the Board "when it accepts a finding of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible or flatly contradicts either a so-called 'law of nature' or undisputed documentary testimony" (citations omitted). NLRB v. Dinion Coil Co., 201 F.2d 484, 490 (2 Cir.1952). See also, NLRB v. Marcus Trucking Co., 286 F.2d 583, 590 (2 Cir.1961).

There was sufficient basis for the Board's interpretation of the 30-day clause. The notice entitled "Our Last Offer," posted in the Respondent's plant for the purpose of advising employees of their right to elect between two union security provisions, makes it evident that the parties did not contemplate an end to the Union contract or the withdrawal of the Union in the event the Union lost

a majority of its members.[1] The testimony of those who attempted to buttress the Respondent's position was of questionable value since two of the witnesses were closely identified with the Company's management and the others, although originally Union members, were not shown to have retained their membership. In any event, we hold that there exists a presumption against the finding of such an agreement during the one-year certification period, in view of the policy of permitting the union to have every opportunity to establish itself during that time, even if it has lost its majority status. See Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

The major question raised by this appeal is whether an employer can be required by the Board to enter into a contract with a duly certified union when the contract, if properly signed, would have expired prior to the Board's enforcement order, and under circumstances where the employer has granted such employee benefits as were demanded by the union and where the union has lost its majority status. We hold that the employer in such a case should be required to enter into a contract with the union and that the Board acted properly here in so ordering. We further hold, in agreement with the Board's findings, that the Respondent's refusal to sign the Union contract constituted a violation of § 8(a) (1) and (5) of the National Labor Relations Act.

Were we merely to weigh the respective equities of the parties we might be inclined to deny enforcement of the Board's orders or, alternatively, to require that the Board conduct another representation election. There are arguments against subjecting the large majority of the employees to the leadership of a union which they have repudiated and to the terms of a two-year contract which by this time would have expired.[2] It would do violence to the Act, however, so to hold, for failure to enforce would encourage purposeful delay in other cases.

Under the Act an existing certification must be honored until lawfully rescinded, possibly subject to the exception originated by the Fifth Circuit, that an employer will not be required to bargain with a union which has demonstrably lost its majority status *and* where the filing of a petition for decertification would be futile. NLRB v. Florida Citrus Canners Cooperative, 288 F.2d 630, 639 (5 Cir.1961). See also NLRB v. Satilla Rural Electric Membership Corp., 322 F.2d 251, 253 (5 Cir.1963); NLRB v. Mayer, 196 F.2d 286, 289 (5 Cir.1952).[3] That exception would not apply to a situation such as here where it was possible for the union to be removed as the bargaining agent of the employees. Those employees who were dissatisfied

---

1. The notice included the following:
    "As we told you previous to the last session, only one major issue remained: Whether there was to be a modified Union Shop or maintenance of membership. In keeping with our established position, we contended that, in our opinion, the majority of our people did not want a Modified Union Shop. The Union felt that our position was incorrect. Since neither party was willing to concede the point, the Union agreed to offer both proposals at *their* meeting for ratification. The issue is to be determined by *secret* ballot." (Emphasis in original.)
    The testimony disclosed that Respondent's management was aware of the notice and its contents. It would appear, moreover, that Respondent was responsible for the posting of this notice, although there was no evidence offered which would clearly establish that fact.

2. The Board's order requires the Respondent upon the Union's request to execute the Union-submitted contract of April 20, 1962, "with an effective terminal date of March 1, 1964."

3. In NLRB v. Mayer, supra, the court expressed the policy behind this exception:
    "If we should compel respondent to bargain further with the Union, which the employees themselves have obviously repudiated, the result would be to deny them the right, secured by the Act, to bargain through the representative of their choice." 196 F.2d 286, 289.

with the union arrangement could have submitted their grievances to the Board, and following the twelve month certification period any remaining dissatisfied employees, under § 9(e) (1) and (2) of the Act, could have filed a petition for a new election.[4] Alternatively, the Respondent might have petitioned the Board for relief.[5] See, e. g., McLean v. NLRB, 333 F.2d 84 (6 Cir.1964).

■ It is clear that wherever there is a change in the representative status of a union, the Board, and not the reviewing court, is the proper body to reassess the change. NLRB v. International Union, Progressive Mine Workers of America, 375 U.S. 396, 84 S.Ct. 453, 11 L.Ed.2d 412 (1964) (per curiam), reversing 319 F.2d 428 (7 Cir.1963); NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1961); Frank Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).[6] See also, McLean v. NLRB, supra. The Board had ample basis for concluding that the Respondent was under a duty to consider and act upon an application for decertification for the sole reason that an unproved charge of an unfair labor practice had been made against the employer.

> "After a union has been recognized or certified as the bargaining agent of employees, the employer is confronted with the maxim, caveat actor, if he refuses to bargain with the union on the ground that the union no longer represents a majority of the employees. But if the employer takes the position that the union has lost its majority, and if it is determined that the position is correct and that the loss of majority was not attributable to unfair labor practices of the employer, then justification for the refusal to bargain has been established." (Citations omitted.) NLRB v. Minute Maid Corp., supra at 710.

No showing was made here that the Board, supposing that Respondent had filed a petition for decertification, would have declined to process the Respondent's petition.

---

4. Section 9(e) (1) and (2), 29 U.S.C.A. § 159(e) (1) and (2), provides as follows:

   "(e) (1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a) (3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer."

   "(2) No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held."

   The Respondent and the Union agreed to sign the contract in April 1962, some six months after the Board authorized election of October 11, 1961. Under the decertification provisions the employees would have been accordingly subject to Union leadership for only a short period of time. A new election could have been scheduled by the Board for some time around October 11, 1962.

5. Section 9(c), 29 U.S.C.A. § 159(c).

   The Fifth Circuit in NLRB v. Florida Citrus Canners Cooperative, supra, concluded that the filing of a petition for decertification would have been futile because at the time the controversy developed the Board was declining to process petitions for elections to determine whether a certified union still had a majority where an unfair labor practice charge against the employer was pending before the Board. That in fact was the policy of the Board at that time. However, in 1960 the same court, in NLRB v. Minute Maid Corp., 283 F.2d 705, 95 A.L.R.2d 660 (5 Cir. 1960), had held that the Board was not relieved of its duty

6. See Frank Bros. Co. v. NLRB, supra:

   "[A] Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. But * * * a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed. After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships." (Citations omitted.) 321 U.S. 702, 705–706, 64 S.Ct. 817, 819.

to enter into a contract with the Union notwithstanding the Union's apparent loss of majority support. In Brooks v. United States, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954), the Supreme Court upheld the Board's determination that the employer had committed an unfair labor practice by refusing to negotiate with a duly certified union which no longer represented a majority of the employees. Said the Court:

"The underlying purpose of this statute [the National Labor Relations Act] is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selection and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence." 348 U.S. 96, 103, 75 S.Ct. 176, 181.

See also, McLean v. NLRB, supra. And the fact that more than two years elapsed between the Respondent's refusal to sign the two-year contract and the Board's order enforcing it does not change the outcome here. Congress has introduced no time limitation into the Act except that in § 10(b). Cf. NLRB v. Katz, supra.[7]

██ Respondent finally contends it was denied the constitutional right of due process by the Board's refusal to investigate the Company's letter of objections to the conduct of the election which was filed with the Board. That argument is also without merit. The Board refused to examine Respondent's complaints because Respondent failed to comply with the Board's regulation requiring the complainant to submit proof of service on the Union. It is within the discretion of the Board "to determine in any case whether an exception should be made to its prescribed rules and regulations." NLRB v. Ideal Laundry and Dry Cleaning Co., 330 F.2d 712, 718 (10 Cir.1964). See also, Kiekhaefer Corp. v. NLRB, 273 F.2d 314 (7 Cir. 1960). Only proof of extraordinary circumstances will cause the reviewing court to find that strict compliance with the Board's regulations was not required. NLRB v. Marshall Maintenance Corp., 320 F.2d 641 (3 Cir.1963).

The contract embodying the agreement between the Union and Respondent was scheduled to terminate on March 1, 1964. As this date has long since passed, we modify the order of the Board to provide that the contract shall have a new effective terminal date of September 1, 1965.

Enforcement of the order of the Board, as modified, is granted.

MOORE, Circuit Judge (dissenting):

The majority has given me a most cogent reason for dissent in saying: "Were we merely to weigh the respective equities of the parties we might be inclined to deny enforcement of the Board's orders or, alternatively, to require that the Board conduct another representation election." I had always supposed that the statuesque figure, usually blindfolded, and referred to as "Justice," held the scales for the very purpose of weighing equities in order to dispense justice. However, if we are to make the blindfold so opaque that she cannot see the

---

7. In Katz the Court remarked:
"The Company urges that, because of the lapse in time between the occurrence of the unfair labor practices and the Board's final decision and order, and because the union was repudiated by the employees subsequently to the events recounted in this opinion, enforcement should either be denied altogether or conditioned on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. The argument has no merit. Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b)." (Citations omitted.)
See also, NLRB v. International Union, Progressive Mine Workers of America, supra.

scale imbalance or, if we are to disregard the equities as recorded on this balancing device, as my colleagues feel that they are compelled to do, there is little chance of achieving justice or, particularly in labor cases, of giving to the employees the right to bargain collectively through representatives of their own choosing. Section 7, National Labor Relations Act.

Again quoting from the majority, there are indeed "arguments against subjecting the large majority of the employees to the leadership of a union which they have repudiated and to the terms of a two-year contract which by this time would have expired." To solemnly order that the employer bargain with a union "as the exclusive representative of the employees" and in late 1964 or early 1965 execute a contract with an "effective terminal date of March 1, 1964" [1] is to give to a modern-day Gilbert and Sullivan or a Charles Dickens further material from which they can ridicule the eccentricities of the law.

I find nothing in the summary reversal in National Labor Relations Board v. International Union, Progressive Mine Workers of America, et al., 375 U.S. 396 84 S.Ct. 453, 11 L.Ed.2d 412 (1964), reversing 319 F.2d 428 (7 Cir., 1963) or in NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) which indicates that the rights of employer and employee specified by the Supreme Court in Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) have been repudiated by that Court. Therefore, I would remand the case to the Board for further inquiry into the facts or, in the alternative, if during such bargaining as may be requested and which may ensue pursuant to the order to be entered, "the employees are dissatisfied with their chosen union" or

the "employer has doubts about his duty to continue bargaining," these respective parties, apparently forced by force of law to become antagonists, have the privilege of seeking that Chimera-like goal of "industrial peace" in the manner approved by the Supreme Court in Brooks v. N. L. R. B., supra at 103, 75 S.Ct. at 181.

---

[1]. The "new effective terminal date to be September 1st, 1965" as specified by the majority creates by judicial fiat a three-year contract instead of the two-year contract which is the only contract even under the Board's interpretation of the facts agreed upon by the parties. It

seems rather inconsistent to order the employer to bargain or, in the alternative, to have the court by frowned-upon "judicial intervention" fix the terminal date never agreed upon or even considered so far as appears from the record.