**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**QUINN RESTAURANT CORP. d/b/a Water's Edge, Respondent.**

No. 1870, Docket 93–4078.

United States Court of Appeals, Second Circuit

Argued Aug. 13, 1993.

Decided Jan. 31, 1994.

Nancy J. Gottfried, N.L.R.B., Washington, DC (Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Frederick C. Havard, Supervising Atty., Marilyn O'Rourke, N.L.R.B., Washington, DC, of counsel), for petitioner.

Richard G. Kass, Mineola, NY (Rains & Pogrebin, Mineola, NY, of counsel), for respondent.

Before: WINTER, MINER and WALKER, Circuit Judges.

WINTER, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order in *Quinn Restaurant Corp. d/b/a Water's Edge*, 293 N.L.R.B. 465 (Mar. 28, 1989). The Board concluded that respondent violated Section 8(a)(5) and (1) of the National Labor Relations Act (the "Act") by refusing to execute a previously agreed upon collective bargaining agreement on the ground that it covered employees who were not properly in the bargaining unit. We grant enforcement of the order except for those portions directing respondent to sign the agreement and to bargain with the Union in question. We deny enforcement of those portions because the Union has disclaimed all interest in representing respondent's employees. The employer must, however, implement the terms of the agreement retroactively as working conditions.

## BACKGROUND

As is so often the case with Labor Board orders, this petition for enforcement reaches us years after the pertinent events. In September 1985, Stuart Somerstein and his wife purchased Water's Edge, a restaurant on the East River in Long Island City, New York. Soon thereafter, Hotel Employees and Restaurant Employees Union, Local 100 of New York and Vicinity, AFL–CIO (hereafter "Union"), filed a petition for a representation election. Quinn and the Union stipulated to the following as an appropriate bargaining unit for a consent election:

All full and regular part-time dining room, bar, kitchen and coat check employees employed by the Employer at its East River location, excluding all valet parking employees, professional employees, office clerical employees, guards, the executive manager, general manager, banquet manager, the chef, the maitre'd, and all supervisors as defined in the Act constitute a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(b) of the Act.

The election was held on December 19, 1985. The Union won.

## A. *Post–Election Threats and Changes in Work Conditions*

Stuart Somerstein admitted to being "upset" after the election. The Administrative Law Judge ("ALJ") credited testimony that Somerstein told the employees that because the Union won the election, "[n]ow we [a]re going to play by the rules." The Board concluded that this statement constituted a threat of unspecified reprisals and violated Section 8(a)(1) of the Act.

Prior to the election, employees were allowed to clock in when they reported for their shift and then take a half-hour to eat dinner. Several days after the election, Dennis O'Reilly, then Quinn's general manager, informed the employees that employees would now have to eat dinner before they punched in. This alteration in working conditions cost the employees a half-hour's wages each day. The Board concluded that this change constituted an unlawful reprisal in violation of Section 8(a)(1) and (3) of the Act, as well as a unilateral change in working conditions without notice to, or bargaining with, the Union in violation of Section 8(a)(1) and (5).

At the time of the change in mealtime practice, O'Reilly also mentioned to the employees that Quinn was "toying with the idea" of including employees' charge-card tips in their weekly paychecks, rather than converting them to cash each night as had been the practice. Although the change was never made, the Board found the threat of the change a violation of Section 8(a)(1) of the Act.

O'Reilly also altered the procedure for changing work schedules. Prior to the election, Carol Welker, a unit employee, prepared the weekly work schedule and allowed employees to freely switch shifts so long as they found a replacement. After the election, O'Reilly handled the work schedule. Although he used essentially the same procedure as Welker, he occasionally rejected employees' proffers of replacements. The Board (in disagreement with the ALJ) found the change sufficiently substantial to constitute an unlawful change in violation of Section 8(a)(3), (1), and (5).

## B. *Quinn's Banquet Work*

When the Somersteins purchased the restaurant in 1985, the building had only a partial second floor. Banquets were held on the second floor and occasionally in the dining room as well. The dining room employees worked as servers at banquets under the supervision of the banquet manager, instead of the general manager. Somerstein testified that he bought Water's Edge with the intention of creating an expanded banquet facility on the second floor. Construction on the project began in November 1985, prior to the election, and was completed in July 1986.

At the representation hearing preceding the election, Quinn initially took the position that no election could be held, because the unit was expanding. Quinn later withdrew this position and agreed to the unit description recited above. While the renovations were ongoing, dining room employees continued to perform banquet services. In June 1986, however, when the second-floor banquet facility was near completion, new employees were hired to staff the banquet facility, although dining room employees still worked banquets on occasion. From June 1986 through 1987, the company's payroll listed between 29 and 52 employees as dining room employees and between 14 and 52 employees as either banquet waiters or banquet kitchen help.

Notwithstanding the physical proximity and the occasional use of dining room employees for banquets, the two floors remained somewhat distinct entities. For example, each had its own kitchen and liquor storeroom. The two groups of employees had separate managers, worked different shifts, and were paid on separate scales, with different practices for sharing tips as well. The banquet employees thus were not included in the bargaining unit agreed upon by the Union and Quinn for purposes of the election and certified by the Board.

## C. *The Negotiations*

On March 3, 1986, the Union submitted contract proposals to Quinn. Several months later, the first bargaining session was held. At the final negotiating session in December

1986, the parties carefully reviewed a draft agreement and agreed upon a contract. Article I of the contract described the bargaining unit as including "banquet [and] catering ... employees." After the Union prepared the contract in final form, Somerstein informed the Union that he wanted his lawyer to examine the agreement. When the Union did not hear from Somerstein or his attorney, Fred Braid, the Union's attorney, Harold Ickes, contacted Braid. From mid-January until late March, Ickes sought unsuccessfully to get Quinn to sign the agreement. Quinn now took the position that the banquet employees were not in the unit and asked for concessions in return for their inclusion. After agreeing to several changes to appease Quinn, Ickes finally balked at a request to change the wage rate for the banquet employees. After several more failed attempts at communication with Braid, on March 27, 1987, Ickes made a final request for the contract to be signed. When Quinn did not comply, the Union filed charges with the Board.

D. *The Board's Decision, Order and Post-Order Events*

The Board concluded that Quinn committed unfair labor practices by threatening unlawful reprisals, altering the mealtime rules, threatening to change the charge-card tip practices, and changing the method of determining employees' work schedules. The Board also concluded that Quinn had violated Section 8(a)(1) and (5) of the Act by refusing to execute the agreement.

The Board ordered Quinn to do the following: execute the collective bargaining agreement with the terms agreed to in December 1986, retroactively apply the terms and conditions of the agreement to make employees whole for any loss of earnings suffered, make employees whole for any loss of mealtime pay, notify the Union in writing that Quinn recognizes it as the exclusive collective bargaining representative of its banquet employees and apply the agreement to them to make them whole for any loss suffered, rescind the work rules that deny employees the right to freely change schedules and that require them to eat before punching their timecards, and to post an appropriate notice.

On February 5, 1990, over four years after the election, the Board petitioned this court for enforcement of its order. On June 8, 1990, however, the Board and Quinn stipulated to the withdrawal of the petition without prejudice to refile. The Board maintains in its brief that the application was withdrawn for the purpose of engaging in settlement efforts. Somerstein has sworn in an affidavit that he "did not receive any communication whatsoever from the NLRB concerning the order sought to be enforced herein from June of 1990 until March of 1993." In late January 1992, Quinn received a letter from Ickes stating that the Union now disclaimed all interest in representing the employees in question. A copy of the letter was sent by Ickes to the Board. In March 1993, over seven years after the election, the Board informed Quinn that it was once again seeking enforcement of its order. The instant petition for enforcement followed on April 13, 1993.

## DISCUSSION

Quinn seeks a denial of enforcement on two grounds. First, Quinn contends that it was justified in refusing to execute the collective bargaining agreement because the banquet employees were not properly a part of the bargaining unit. Second, Quinn contends that we should deny enforcement because of the Board's delay in seeking enforcement and changed circumstances—principally the Union's disinterest in representing the employees—between the Board's order and now. We address these contentions in turn.[1]

---

1. Quinn does not contest the Board's conclusions that it violated Section 8(a)(1) of the Act by threatening unlawful reprisals, that it violated Section 8(a)(1) and (3) of the Act by threatening to change the charge-card tip practice, nor that it violated Section 8(a)(3), (5) and (1) of the Act by discontinuing paying employees during their mealtime and by changing the method of determining employees' work schedules. We therefore enforce those portions of the Board's order concerning these violations. *See NLRB v. Vanguard Tours, Inc.*, 981 F.2d 62, 67–68 (2d Cir. 1992).

## A. Quinn's Refusal to Execute the Collective Bargaining Agreement

■ The Board found that Quinn and the Union had reached an agreement[2] and concluded that Quinn's failure to execute the contract constituted an unfair labor practice. We agree.

Section 8(d) of the Act provides that the duty to bargain in good faith encompasses the "execution of a written contract incorporating any agreement reached if requested by either party." 29 U.S.C. § 158(d) (1988). Accordingly, an employer's refusal to sign an agreement embodying terms agreed upon is a violation of Section 8(a)(5) and (1) of the Act. *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–26, 61 S.Ct. 320, 325, 85 L.Ed. 309 (1941); *NLRB v. Midvalley Steel Fabricators, Inc.*, 621 F.2d 49, 53 (2d Cir.1980).

■ Quinn argues that the banquet employees were not a proper accretion to the existing bargaining unit, *see NLRB v. Stevens Ford, Inc.*, 773 F.2d 468, 472–73 (2d Cir.1985), and, therefore, Quinn would have committed an unfair labor practice by signing a collective bargaining agreement that purported to cover those employees. However, when an employer bargains to an agreement and then refuses to execute that agreement on the ground that it covers employees who are not appropriately in the bargaining unit, its objection must be viewed as presumptively pretextual. We need not decide, therefore, whether the banquet employees were properly accreted to the existing unit.

The Board and the courts have recognized that an employer who has agreed to bargain with a certain unit cannot refuse to execute the contract on the ground that the unit is inappropriate. In *Arizona Electric Power Cooperative, Inc.*, 250 N.L.R.B. 1132, 1980 WL 12120 (1980), the Board found an unfair labor practice in an employer's refusal to bargain over the inclusion of employees who were not in the unit certified but who had been included in earlier collective bargaining agreements. The Board said: "The Board may appropriately issue a bargaining order

covering a unit which it could not have initially certified under the Act, but concerning which the parties have knowingly and voluntarily bargained." *Id.* at 1333.

In *E.G. & H. Inc. v. NLRB*, 949 F.2d 276 (9th Cir.1991), the employer reached agreement with its employees' representative on a contract that included supervisors in the bargaining unit. *Id.* at 276–77. The employer then refused to execute the agreement on the ground of unit inappropriateness. While conceding that the unit was inappropriate, the court nonetheless rejected the employer's contention: "In this case, even though the agreement had not yet taken effect, the parties had completed bargaining, and the Board has found that both parties believed they had reached an agreement.... [I]t would be ... destructive of stable bargaining relationships to permit an employer, after voluntarily agreeing to bargain with a particular unit, to repudiate an agreement on the ground that the unit was not appropriate." *Id.* at 279.

While the parties in the instant matter did not have long-standing collective bargaining agreements that covered the non-unit employees as in *Arizona Electric Power* and *E.G. & H. Inc.*, Quinn's last-second interjection of the issue rings no less false. Quinn bargained with the Union for almost nine months prior to reaching an agreement and at no point during this period objected to the inclusion of the banquet employees. Moreover, Quinn used the status of the banquet employees as a bargaining chip to gain concessions. In light of this bargaining history, Quinn's posturing as the protector of its banquet employees' rights is pretextual. *Cf. Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954) ("The underlying purpose of th[e] statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it."); *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 490 (2d Cir.1975).

■ We in no way suggest that employers have a duty to bargain over non-unit

---

**2.** Quinn states in a footnote that it contests the Board's finding that the parties reached final agreement in December 1986. However, the Board's finding that the parties reached agreement was amply supported in the record and was based on the ALJ's credibility determination.

employees. *In re Local One Amalgamated Lithographers of America v. Stearns & Beale, Inc.*, 812 F.2d 763 (2d Cir.1987). All we hold is that where, as here, the employer has bargained to reach an agreement that includes employees not in the certified unit, the employer may not thereafter seize upon the inclusion of those employees as grounds for refusing to execute the agreement. To hold otherwise would make available to recalcitrant employers a tactic that would render the duty to bargain substantially meaningless by allowing unit considerations, properly a threshold issue, to delay real bargaining for months and years. Although there is some danger that a group of employees will be represented by a union they do not want, that danger is likely to be minimal where, as here, bargaining has proceeded for an extended period of time without complaint from the employees. Finally, in most cases, again as here, inclusion of the employees does not create an inappropriate unit. Even if the banquet employees might constitute an appropriate separate unit, a unit including both the regular dining room employees and the banquet employees would not be facially inappropriate.

### B. *The Board's Delay in Seeking Enforcement*

 Quinn also argues that enforcement of the Board's order should be denied because of the Board's delay in seeking enforcement and of changed circumstances since the issuance of the Board's order. Specifically, Quinn relies on our decision in *Emhart Indus. v. NLRB*, 907 F.2d 372 (2d Cir. 1990).[3]

We have been reluctant to deny enforcement of Board orders purely on the grounds of delay. Although the delay here has not been adequately explained by the Board, denying enforcement would "punish[ ] employees for the Board's nonfeasance." *NLRB v. International Assoc. of Bridge, Structural & Ornamental Ironworkers, Local 480*, 466 U.S. 720, 725, 104 S.Ct. 2081, 2084, 80 L.Ed.2d 715 (1984) (per curiam). The Act imposes no time limits on the Board's authority to seek enforcement of its orders, NLRA § 10(e), 29 U.S.C. § 160(e), and the Supreme Court has held that a two and one-half year delay between the Board's order and its petition for enforcement does not preclude the Board from seeking enforcement. *NLRB v. Pool Mfg. Co.*, 339 U.S. 577, 580, 70 S.Ct. 830, 832, 94 L.Ed. 1077 (1950).

When the Board's delay leads to a change in circumstances that affects the appropriateness of the Board's order, however, a different situation is presented. We have thus stated:

> [T]he courts of appeals have been charged by congress with "responsibility for the reasonableness and fairness of Labor Board decisions", and if we were simply to ignore the effects of administrative delay, we would abandon this important supervisory responsibility. Therefore, while NLRB orders are normally "subject to limited judicial review", we must withhold enforcement of orders that will not effectuate any reasonable policy of the act. . . .

*Emhart Indus.*, 907 F.2d at 379 (citations omitted). *See also Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 189 (2d Cir.) (denying enforcement of Board order that would serve no legitimate purpose), *cert. denied*, ── U.S. ──, 112 S.Ct. 168, 116 L.Ed.2d 132 (1991). In *Emhart Indus.*, we denied enforcement to a Board order that sought to remedy the unfair labor practice of the employer reinstating strikers based on

---

**3.** Quinn also invokes the common law policy of repose and the equitable defense of laches. While Quinn asserts that the policy of repose is "not necessarily embedded in statutes of limitations," Quinn directs us to no case applying such a "policy of repose" in the absence of a statute of limitations, nor have we seen such an instance. While the concern with protecting parties' interests in repose from interference by the Board is embodied in our *Emhart Indus.* line of cases, little would be served by recognizing an independent "policy of repose."

Quinn's invocation of the equitable defense of laches also fails. As Quinn acknowledges, the party asserting a defense of laches must show prejudice. *NLRB v. Michigan Rubber Prods., Inc.*, 738 F.2d 111, 113 (6th Cir.1984). While Quinn vaguely asserts that it has been "making strategic and investment decisions" on the assumption that the Board would not seek enforcement, Quinn has not cited specific decisions that would have been made differently because of that assumption.

plant-wide seniority close to seven years earlier. 907 F.2d at 379–80. In the years following the ALJ's decision and preceding the Board's, the employer and the union had reached two collective bargaining agreements that permitted this very practice. In addition, the Board ordered cease-and-desist and posting relief at one of the employer's facilities that had been closed for years. On these facts, the court concluded that "enforcement of the order ... would mock reality." *Id.*

In the instant matter, the Board's order required Quinn to execute the collective bargaining agreement and make the employees covered by the contract whole for any loss, rescind the unlawfully instituted work rules, cease and desist from violating its employees' rights, post the usual notice, and recognize the Union in writing as the exclusive bargaining representative of its banquet employees. Most of the Board's order is appropriate remedial relief. Requiring the employer to make employees whole for lost wages and to rescind unlawful work rules requires discrete acts that are not an inappropriate imposition on the employer, even given the passage of so much time. *See NLRB v. S.E. Nichols, Inc.,* 862 F.2d 952, 963 (2d Cir.1988), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989); *NLRB v. Warrensburg Bd. & Paper Corp.,* 340 F.2d 920, 923 (2d Cir.1965). The fact that the collective bargaining agreement, if executed, would have expired by now does not alter Quinn's obligation to implement its terms retroactively. *Id.*

However, the order also requires that Quinn sign the agreement with the Union and recognize the Union as the exclusive bargaining representative of its employees. These requirements are wholly inappropriate, because the Union has disclaimed any interest in representing Quinn's employees. Presumably, the employees reciprocate that disinterest, or, if interest on their part continues, it is unrequited. Forcing Quinn to recognize the Union would frustrate the employees' right to select their bargaining representative, and enforcement of this portion of the order would therefore be contrary to fundamental purposes of the Act. Indeed,

the presence of the order would effectively stymie attempts at organization by another union and perhaps, given the pace of Board proceedings, prolong this litigation into the Twenty–First Century.

The Board, while not seriously disputing that the Union's disclaimer makes this portion of the order inappropriate, maintains that the Union's disinterest is an issue to be addressed only at the compliance stage of the proceedings. At oral argument, however, Board counsel acknowledged that Quinn would be obligated to obey the order to bargain with the Union when our mandate issued, well before the compliance stage of the proceedings. When asked why we should enter an order that would subject the employer to contempt sanctions for not recognizing a disinterested union, counsel for the Board suggested that the Board would not seek contempt sanctions in this instance because the Board is not "stupid." In response, we requested that counsel consult with her superiors as to whether the Board, on reflection, would seek entry of an order that required immediate obedience on Quinn's part even though it would be "stupid" for us or the Board to take steps to implement it. The answer forthcoming was in the affirmative.

The Board thus asks us to enter an admittedly inappropriate but immediately effective order because the Board would not be "stupid" enough to seek compliance with it. Not surprisingly, no caselaw cited by the Board supports such an unprofessional position. In *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), for example, the Court approved of the Board's practice of deferring the "specific calculations" of the amount of back pay to the compliance proceedings. *Id.* at 902, 104 S.Ct. at 2814. Justice Frankfurter's concurrence in *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 411, 80 S.Ct. 441, 447, 4 L.Ed.2d 400 (1960), also states merely that determinations of amounts of back pay to be awarded are properly left to the compliance proceedings. Likewise, in *NLRB v. Dazzo Prods., Inc.,* 358 F.2d 136 (2d Cir.1966), a case involving the issues of how to award back pay and reinstatement to a seasonal worker, we held that "the employ-

er's precise duties as to reinstatement of and back pay for [the employee] are matters to be resolved ... in compliance proceedings." *Id.* at 138.

In each of these cases, the question was the specific implementation of a general order. Significantly, in none of these cases was the Board's order in need of correction. None of these cases thus addressed a situation where a portion of the enforced order needs to be deleted to reflect reality. Obviously, judicial recognition that issues such as the calculation of amounts of back pay are best left to compliance proceedings does not translate into a requirement that we enter admittedly obsolete and erroneous orders in the hopes that the Board will subsequently void them.

Under these circumstances, enforcement of the Board's order insofar as it requires Quinn to sign the agreement with the Union—in contrast to implementing its terms as working conditions retroactively—and to recognize the Union as the exclusive bargaining representative would truly "mock reality." *Emhart Indus.*, 907 F.2d at 380. Therefore, we grant enforcement of all portions of the Board's order except those that require Quinn to sign the agreement and to recognize and bargain with the Union.