NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MIDVALLEY STEEL FABRICATORS,
INC., Respondent.

No. 688, Docket 79–4180.

United States Court of Appeals,
Second Circuit.

Argued Jan. 21, 1980.

Decided April 7, 1980.

J. Keith Gorham, Washington, D. C., N.
L. R. B. (Jay E. Shanklin, Atty., Norton J.
Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E.
Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel,
N. L. R. B., Washington, D. C., of counsel),
for petitioner.

Richard M. Naness, Hewlett, N. Y. (Milman, Naness & Pollack, Hewlett, N. Y., of counsel), for respondent.

Before SMITH,* FEINBERG, Circuit Judges, and GAGLIARDI, District Judge.**

FEINBERG, Circuit Judge:

The National Labor Relations Board applies for enforcement of its order issued against respondent, Midvalley Steel Fabricators, Inc. In a decision and order reported at 243 N.L.R.B. No. 83 (1979), the Board found that Midvalley had violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to execute an agreed-upon collective bargaining agreement, by shifting its position on previously agreed-upon terms and by refusing to bargain in good faith. The Board ordered respondent, among other things, to execute the collective bargaining agreement upon the request of the bargaining agent for the Midvalley employees, Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO (Union). The central issue before us is whether substantial evidence on the record as a whole supports the Board's findings. For reasons given below, we answer that question in the affirmative, and we enforce the Board's order, modified to reflect the bargaining unit stipulated to by the parties.

I.

In January 1978, the Board issued a complaint charging that Midvalley had violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5). After a hearing, the Administrative Law Judge (ALJ) made the following findings of fact: Joseph Charla, Jr., was at all relevant times the president of Midvalley, a small structural steel fabrication plant. As president of another steel fabrication plant, the Joseph Charla Iron Works, Inc. (Charla Iron), Charla had negotiated and signed a number of collective bargaining agreements with the Union over a twenty-year period; during many of those years, the Union representative in all negotiations with Charla Iron was William Colavito. Early in October 1977, the Union began a campaign to organize the employees of Midvalley. Colavito met with Charla late in October and requested that the Union be recognized as the collective bargaining agent for Midvalley's employees; Colavito offered to prove that a majority of the employees had signed authorization cards, but Charla indicated that such proof was unnecessary and acquiesced in the Union's claim.

Over the next few weeks, Colavito and Charla met on numerous occasions to discuss the terms of a collective bargaining agreement; no other persons were present during these meetings. At a meeting on October 31, 1978, Colavito proposed that Midvalley employees be paid at rates lower than those paid to employees in the New York City area who were covered by the Union's Standard Independent Contract (Standard Contract); Charla promised that he would study this proposal, as well as the Union's proposals relating to vacations, sick leave and severance pay. Two meetings followed at which the parties sought to work out a satisfactory wage differential; they also discussed modifying the provisions of the Standard Contract concerning holidays, pay for Saturday work and seniority. On November 8, Colavito made another proposal concerning wage rates. Charla agreed with the proposal and then said, "Fine, let me get ahold of my attorney and we'll set up a meeting, you get ahold of your attorney and we'll clean it up." Charla also requested two copies of the current Standard Contract for his attorney; Colavito delivered these copies on November 10.

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Feinberg and Gagliardi, who are in agreement on this opinion. Judge Smith, who heard the argument, unfortunately died on February 16, 1980. Prior to his death, Judge Smith voted to enforce the Board's order as modified and was in agreement with his colleagues on all issues in the case. He did not have the opportunity, however, to see this opinion prior to his death.

** Honorable Lee P. Gagliardi, District Judge of the Southern District of New York, sitting by designation.

Prior to their next meeting, Colavito telephoned Charla and suggested that he would prepare a draft of contractual provisions upon which they had agreed in order to save time at their next session. Charla responded that this was "Fine . . . ." On November 12, Colavito gave Charla a copy of the handwritten draft agreement Colavito had drawn up, and asked Charla to read it over for mistakes or omissions. Having done so, Charla acknowledged that the agreement seemed satisfactory; he also told Colavito that if he found "any mistakes or anything missing" he would call by the evening of the following day. Not having heard from Charla, Colavito called him on November 14; Charla told him that his attorney was still out of town. Charla spoke to Colavito on November 17 and told him "You're not going to like what I'm going to tell you, there are four points that I'm going to have to change." The four changes Charla wanted were: exclusion of truck drivers from the bargaining unit; revision of pay rates; elimination of the pension provision; and a different termination date for the contract. Colavito protested these changes, but agreed to meet with Charla.

The parties met again on November 19. Colavito acceded to Charla's demands to eliminate drivers from the unit and to revise the termination date; he refused, however, to change the pay rates or the pension plan because Charla already had agreed to these provisions. Colavito pointed out that these terms were incorporated in the November 12 draft agreement, and that Charla had never tendered any objections to the draft either on that date or later. Charla's only response was that "I never shook your hand." Charla suggested that they meet again on November 21, at which time the positions of the parties remained unchanged. Subsequently, the Union filed charges with the Board.

## II.

Since respondent does not dispute the foregoing findings of fact, we simply note that there is ample basis for them in the record. Colavito, the Board's principal witness at the hearing, testified as to the events related above and was extensively cross-examined by counsel for Midvalley. In contrast, Charla, who was Midvalley's single witness, testified only as to his name, address and position with Midvalley. Consequently, Colavito's testimony was uncontradicted. The ALJ found Colavito to be "a frank and forthright witness" whose testimony was "a substantially accurate account of what transpired in his numerous meetings with Mr. Charla."

Respondent does dispute, however, the inferences the Board drew from the ALJ's findings of fact. Like the ALJ, the Board concluded that on November 17 Midvalley shifted its position on previously agreed-upon terms, thereby violating sections 8(a)(5) and (1) of the Act. Similarly, both the ALJ and the Board found that Midvalley's conduct subsequent to that date was in derogation of its obligation to bargain in good faith. But in contrast to the ALJ, the Board also found that Midvalley had agreed to all of the terms of the draft contract submitted by the Union on November 12, and that therefore respondent's failure to execute the contract was in violation of sections 8(a)(5) and (1). Respondent contends that the Board's conclusions are not supported by substantial evidence on the record as a whole. We disagree.

The record leaves no room for doubt that, as both the Board and the ALJ found, Midvalley shifted its position on agreed-upon terms on November 17 and thereafter failed to bargain in good faith. Midvalley takes the position that the discussions between Charla and Colavito were to be "off the record," and that any agreement reached was to be subject to the approval of Midvalley's attorney. Midvalley also contends that Colavito and Charla never agreed on any terms at all; instead of a meeting of the minds, there was simply a series of offers and counteroffers, none of which were accepted. These arguments are contrary to the evidence.

We turn first to the contention that these meetings were "unofficial" in that no attor-

ney was present. Prior to the parties' first meeting, Colavito suggested to Charla that they negotiate without attorneys; Charla concurred in this suggestion, noting that "Attorneys cost a lot of money anyway." Neither then nor at any other time did Charla indicate that any agreement he made would be subject to the approval of Midvalley's counsel; indeed, such a reservation would have defeated the purpose of meeting without attorneys in the first place. Not until November 8 did the subject of attorneys come up again. At the meeting on that date, Charla and Colavito agreed upon certain terms; Charla then proposed that the parties contact their respective attorneys for the purpose of setting up a meeting at which they could "clean it [the contract] up." While it is true that Charla requested two copies of the Standard Contract for his attorney, this is not inconsistent with the view that attorneys would play only a limited role in these negotiations, as the Board argues to us; the contract was to be submitted to the attorneys for "cleaning up," not for modification or approval of its substantive terms.

The evidence similarly belies the argument that the parties failed to agree on any contract terms whatsoever. On November 8, according to Colavito's uncontradicted testimony, Charla agreed to the Union's proposed reduced wage rate. On November 12, Colavito gave Charla a draft of those terms he believed that the parties had agreed to; Charla read the draft and indicated that it seemed "all right." Moreover, he did not call Colavito on November 13, as he had said he would if he found "any mistakes or anything missing." We agree with the Board that this conduct entitled the Union to conclude that respondent had committed itself to the terms set forth in Colavito's draft. That the parties "never shook" hands is irrelevant; Charla clearly manifested his assent to these terms both by his explicit statements on November 8 and 12 and by his silence on November 13.

The ALJ found, however, that while the parties had agreed as to some terms, there was not a meeting of the minds as to all terms of a completed contract; accordingly, the ALJ held that the failure to execute the draft contract did not violate the Act. Colavito's November 12 draft stated that the parties "have agreed to adopt as their Collective Bargaining Agreement the Standard Independent Agreement . . . with the following modifications:" there followed a list of the specific modifications upon which the parties had agreed. The ALJ concluded that this incorporation by reference of the Standard Contract constituted a "substantial addition" to the proposed contract and that therefore Midvalley's counsel was entitled to an opportunity to study it; since Charla did not receive a copy of the Standard Contract until November 10, the ALJ felt that respondent's counsel never had such an opportunity.

 In contrast, the Board found that the Standard Contract represented the starting point of the negotiations between Charla and Colavito, rather than a "substantial addition" to the contract upon which they had agreed. We find that the Board's analysis of the uncontroverted facts is persuasive. Charla was familiar with the Standard Contract since he previously had negotiated and signed such a contract as the representative of Charla Iron.[1] From the outset of the meetings between Charla and Colavito, the discussion focused on modifying certain provisions of the Standard Contract. Charla made clear that the rates paid to workers in New York City under the Standard Contract were too high; the parties therefore sought to work out an acceptable differential. Nor were the pay rates the only provisions of the Standard Contract over which the parties bargained. Charla sought a different termination date from that provided for by the Standard Contract; he also wished to modify the Standard Contract's holiday schedule, se-

1. As a result of the Charla Iron negotiations, Charla was familiar with an earlier version of the Standard Contract. As the Board noted, it was Colavito's uncontradicted testimony that the earlier and later versions of the Standard Contract were essentially identical in relevant details.

niority clause, pension provisions and overtime rates. Thus, there was substantial evidence that Charla was aware of, and bargained for certain modifications of, the terms of the Standard Contract.[2] We note, moreover, that Charla never stated to Colavito any objection concerning the incorporation of the Standard Contract; in fact, all of the changes demanded by Charla on November 17 involved the parties' bargained-for modifications to the Standard Contract rather than the terms of the Standard Contract itself.

We therefore hold that there was sufficient support for the Board's conclusion that Midvalley violated sections 8(a)(5) and (1) both by its change of position on and after November 17 and by its failure to execute the draft contract. Since the draft embodied agreed-upon terms, it was within the Board's power to order respondent to execute the draft upon the Union's request. See *H. J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–26, 61 S.Ct. 320, 325–326, 85 L.Ed. 309 (1941); *NLRB v. Coletti Color Prints, Inc.*, 387 F.2d 298, 304–06 (2d Cir. 1967).

### III.

We conclude, however, that the Board erred in its determination that drivers should be included in the collective bargaining unit here. The November 12 draft contract submitted by Colavito did include truck drivers within the appropriate unit. But in response to one of the objections tendered by Charla on November 17, Colavito agreed to eliminate drivers from the unit. Were this all, we would agree with the Board's initial argument in its brief to us that the appropriate unit should include drivers, since to hold otherwise would give respondent the benefit of its bad faith bargaining. At oral argument, however, the Board conceded that the unit should exclude drivers, as the ALJ held. We agree. The modification obtained by Charla was in fact appropriate, and not simply an unwilling concession by the Union. Before the ALJ, the parties stipulated that the unit should exclude drivers, and the ALJ so found. Accordingly, we hold that Midvalley will be required to sign upon the Union's request the November 12 contract, as modified to indicate that the unit excludes drivers.[3]

The Board's order is enforced, as modified.

---

2. The "substantial evidence" standard of review "is not modified in any way" by the failure of the Board and the ALJ to agree on this issue. See *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492–97, 71 S.Ct. 456, 466–469, 95 L.Ed. 456 (1951); cf. *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 364–65, 75 S.Ct. 855, 859–860, 99 L.Ed. 1147 (1955). Nor is any special weight to be given to the inferences drawn by the ALJ from the undisputed facts in this case; as we have noted in prior opinions, " [w]hile only the trial examiner can fully evaluate credibility, the Board is fully as capable of weighing the other inferences . . . .' " *NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292, 296 n. 4 (2d Cir. 1972) (quoting *NLRB v. Park Edge Sheridan Meats, Inc.*, 341 F.2d 725, 728 (2d Cir. 1965)).

3. Midvalley also contends that it was entitled to refuse to bargain with the Union, since the Union represented an inappropriate unit that included drivers. However, it is not clear that such a unit would have been inappropriate in the absence of the stipulation. Moreover, the issue had not been raised before, and the Union immediately acceded to Midvalley's request to exclude drivers from the unit; accordingly there is no basis for Midvalley's assertion that it refused to bargain because the collective bargaining unit was inappropriate.

Midvalley also argues that the Board's complaint should have been dismissed because the pleadings, which alleged that Midvalley had refused to bargain with regard to a unit excluding drivers, failed to conform to the proof, which showed that Midvalley had refused to bargain concerning a unit including drivers. Midvalley has not asserted, however, that it was in any way prejudiced by this alleged variance between pleadings and proof, and we therefore find that a dismissal of the Board's complaint was not required.